JIMÉNEZ, PETITIONER, v. REILY, RESPONDENT.

PETITION for a Writ of Mandamus Directed to the Governor of Porto Rico.

No. 203.—Decided June 1, 1922.

MANDAMUS—GOVERNOR—MUNICIPAL JUDGE—REMOVAL FROM OFFICE—NOTICE AND HEARING—CONSTRUCTION OF LAW.—The Act of March 9, 1905, which provides that "the term of office of municipal judges whose offices are created by this act shall be for four years; but they shall be subject to removal at any time by the Governor for cause shown," was not repealed by section 49 of the Jones Act in accordance with the terms of sections 57 and 58 thereof as a necessary consequence of any implied power of removal involved in the power of appointment conferred by said section 49; therefore, a writ of mandamus lies to compel the Governor of Porto Rico to reinstate a municipal judge who has been removed from office without notice or a hearing.

The facts are stated in the opinion.

*Messrs. R. Rivera Zayas* and *J. Jiménez Sicardó* for the petitioner.

*Messrs. M. A. Muñoz* and *J. A. Loret* for the respondent.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

On October the 16th, 1921, petitioner received the following letter:

"Executive Mansion. — Porto Rico. — Office of the Governor.—

Governor's Palace.—San Juan, Porto Rico.—San Juan, Porto Rico, October 15, 1921.—Mr. Gustavo Jiménez Sicardó, Municipal Judge of San Juan, San Juan, Porto Rico.—Sir:—This is to notify you that I have this day removed you from the office of Municipal Judge of San Juan, for the good of the People of Porto Rico. Same is to become effective at once.—Yours truly, (Signed) E. Mont. Reily,— Governor.''

To this communication petitioner replied as follows:

''San Juan, P. R., Oct. 17th, 1921.—Hon. E. Mont Reily, Governor of Porto Rico, San Juan, P. R.—Sir:—Your letter of the 15th inst. received, removing me from the office of Municipal Judge of San Juan Section One, for the good of the People of Porto Rico, same to become effective at once.—Ignorant as I am, of the causes for such removal; and, assured, as I am, of having always complied with the duties pertaining to such office. I hereby request of Y. H. to reinstate me in said office.—Hoping to receive your answer, complying with or refusing this demand, within the following forty-eight hours from receipt of this communication, I am, Respectfully, (Signed) Gustavo Jiménez Sicardó.—Allen 79, San Juan, P. R.''

The petition alleges that on May the 5th, 1921, and by and with the advice and consent of the Senate, petitioner had been appointed by the Hon. Arthur Yager, then Governor of Porto Rico, to the office of Municipal Judge of the Municipal Judicial District of San Juan, First Section, for a term of four years to run from the date upon which he took the oath and assumed the duties of his office; that these formalities were complied with on May the 5th, 1921, and that petitioner continued to discharge his official duties up to the date on which he received the communication first above mentioned whereby he was illegally and arbitrarily deprived of this privilege and of the rights incident thereto without the formulation of any charges whatever; without notice of any such charges; without a hearing or opportunity to defend or to answer or to present evidence or to be confronted by and to cross-examine the witnesses against him; without just cause, and without due process of law, in open

and flagrant violation of the law of 1904 creating the office of municipal judge, amended in 1905; of subdivision 1 of section 2 of the Organic Act, and of the Fourteenth Amendment to the Constitution of the United States; and that defendant has refused to reinstate petitioner in his said office.

Notice of the application and a hearing were ordered and at the hearing a time within which to file briefs was fixed.

In the brief for the Governor the Attorney General insisted that petitioner was not entitled to the writ upon the facts stated in the petition:

1st. Because the writ does not lie against the Governor of Porto Rico.

2nd. Because the duty, if any, to reinstate petitioner is a matter within the exclusive discretion of the Governor and not of a ministerial nature.

3rd. Because the Governor of Porto Rico has absolute and discretional power to remove a municipal judge.

4th. Because petitioner had other adequate remedies.

The first, second and fourth of these questions had been settled adversely to the contention of counsel for defendant by previous well considered decisions of this court, and the brief above mentioned disclosed no such error in the doctrine heretofore announced as to justify the overturning of established precedents. Upon this point there was no difference of opinion among ourselves.

We were unable to agree, however, upon a *per curiam* memorandum submitted by the former Chief Justice proposing the issuance of an alternative writ; and, after considerable discussion of the cases cited under the third proposition submitted by the Attorney General, another day was set for a hearing upon the following questions:

"First: As to the intention of Congress, with reference to the power of removal, in conferring upon the Governor by section 49 of the Jones Act the power to appoint the 'judges, marshals and secretaries of courts now established or that may hereafter be estab-

lished in Porto Rico, and whose appointment by the President is not provided for by law,' viewed in the light of jurisprudence, especially that established by the national Supreme Court.

"Second: As to whether or not the provisions of a law fixing the tenure of office (*que fije término al nombramiento de los funcionarios*) and providing that the Governor may remove for cause shown may be regarded as limiting, inconsistent or incompatible with the power of removal involved in the power of appointment.

"Third: Whether or not the law, among others, of March the 9th, 1905, which provides that 'the term of office of municipal judges whose offices are created by this Act shall be for four years; but they shall be subject to removal at any time by the Governor for cause shown,' must be regarded as having been repealed by section 49 of the Jones Act in accordance with the terms of sections 57 and 58 thereof in so far as the same may be in conflict with the said power of removal involved in the power of appointment."

A second brief filed by the Attorney General adds little or nothing to the argument and authorities cited in support of the third proposition submitted at the first hearing.

The theory of counsel for the Governor is in substance that, by virtue of section 12 of the Organic Act vesting in him "the supreme executive power" and giving him "general supervision and control of all the departments and bureaus of the Government in Porto Rico, so far as is not inconsistent with the provisions of this act," and by virtue of the power of appointment conferred in section 49, *supra,* the Governor of Porto Rico, as the representative of the President and of the National Government in this Island, has the same power that the President of the United States has under the Federal Constitution, and, therefore, that the power of appointment under consideration herein necessarily includes an absolute power of removal.

The following authorities are cited in support of this proposition: Story on the Constitution, vol. 2, 5th edition, sec. 1543; an opinion rendered by Attorney General Cushing on March 26, 1853, 6 Op. Attorney General U. S. 4; another

by the same author, 8 Op. Attorney General U. S. 223; another in 1868 by Attorney General Browning, 12 Op. Attorney General 421, 416; another by Attorney General Devens in 1878, 15 Op. Attorney General 421, and another by Attorney General Crittenden in 1851, 5 Op. Attorney General 288, 290, 291; *Parsons* v. *United States,* 167 U. S. 324, 334; *Reagan* v. *United States,* 182 U. S. 419; *Shurtleff* v. *United States,* 189 U. S. 311; *Hennen* v. *United States,* 13 Peters 230, 260; *Sayers* v. *Wilmington,* 49 Atl. 931, approved in *Menghan* v. *Lewis,* 10 Ann. Cas. 1050; *Warner* v. *People,* 2 Denio, 272, 43 Am. Dec. 740; *People* v. *Draper,* 15 N. Y. 552; *People* v. *Raymond,* 37 N. Y. 433; *People* v. *Albertson,* 55 N. Y. 55; *Mannie* v. *Hatfield,* 118 N. W. 817, and *Clayton* v. *Utah Territory,* 132 U. S. 632.

The decisions of the Supreme Court above mentioned have been the subject of warm debate among ourselves; several successive memorandums have been submitted and the discussion has taken a much wider range than that of the argument contained in the briefs. We cannot undertake within the limits of a judicial opinion to dwell at length upon all questions so raised. Only a few of the more salient features of the opposition to an issuance of the alternative writ will be noticed.

It has been earnestly urged:

First, quoting from *Martin* v. *Hunter,* 1 Wheaton, 326, that (italics ours): "The constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specifications of its powers, or to declare the means by which those powers should be carried into execution. It was foreseen, that this would be perilous and difficult, if not an impracticable, task. The instrument was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages, the events of which were locked up in the inscrutable purposes

of Providence. It could not be foreseen, what new changes and modifications of power might be indispensable to effectuate the general objects of the charter; and restrictions and specifications, which, at the present, might seem salutary, might, in the end, prove the overthrow of the system itself. Hence, its powers are expressed in general terms, *leaving to the legislature, from time to time, to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers, as its own wisdom, and the public interests, should require."*

Second, quoting from Cooley on Constitutional Limitations, page 68: "A cardinal rule in dealing with written instruments is that they are to receive an unvarying interpretation, and that their practical construction is to be uniform. A constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable.  *  *  *  What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."

Also, quoting *Ex parte Woods,* 16 L. R. A. 455: "The Constitution governs. It is literally, thus, a pillar of cloud by day, and by night a pillar of fire; to give us light, and with us, it is 'to go by day and by night.' "

"Likewise, when words having a well-known meaning are written into a constitution it must be presumed that Congress used them with such well-understood meaning." *Schuck* v. *United States,* 195 U. S. 65; *People* v. *Rosaly,* 227 U. S. 270.

Third, "that the legislature has only the very slightest control over constitutional officers, and generally cannot take

away from their duties, their terms, their power of appointment." *Citing People ex rel. Burby* v. *Howland,* 41 L. R. A. 838; 23 R. C. L. 382; *State ex rel. Kennedy* v. *Brunet,* 7 Am. Rep. 84; *State ex rel. Hovey* v. *Noble,* 4 L. R. A. 101; *State ex rel. Geake* v. *Fox,* 56 L. R. A. 893; *Rathbone* v. *Wirth,* 150 N. Y. 459; *State ex rel. Buell* v. *Frear,* 34 L. R. A. (N S.), 491; *State ex rel. Sweet* v. *Cunningham,* 89 Wis. 81, 57 N. W. 1119; *State ex rel. Bickett* v. *Knight,* L. R. A. 1915F, 898; *Woods* v. *Vormun,* 24 Pac. 843; *Rankin* v. *Jauman,* 36 Pac. 504.

Fourth, quoting from *United States* v. *Babbitt,* 1 Black, 561: "What is implied in a statute, pleading, contract or will is as much a part of it as what is expressed," which is said to be equally applicable to constitutions, citing Sutherland on Statutory Construction, par. 334; 8 Cyc. 742; *McCulloch* v. *Maryland,* 4 Wheaton 316.

Fifth, quoting from *Warner* v. *People,* 2 Denio, 272, 43 A. D. 740, said to be somewhat *in pari materia:* "Where a certain power is given by a constitution all the incidents of that power are given with the grant and any act of a legislature in derogation or limitation of that power or any of its incidents is unconstitutional and void." Citing *Tel. Co.* v. *Eyser,* 19 Wall. 427; *Township* v. *Talcott,* 19 Wall. 676; *Luria* v. *United States,* 231 U. S. 24, and cases cited; *Higgins* v. *Richards,* 77 S. W. 946; 8 Cyc. 74; 12 C. J. 719; 36 Cyc. 1112, and especially note 88.

Sixth, that it is a well established principle of construction that "specific terms covering the given subject matter will prevail over general terms in the same or another statute which might otherwise prove controlling," citing *Kepner* v. *United States,* 195 U. S. 100; *Palliser* v. *Home Telephone Co.,* 44 So. 578.

That "whenever Congress legislates upon any subject directly in relation to the government of the people of the territory, then it ceases to be a rightful subject of territorial

legislation," citing *Allen* v. *Reed,* 60 Pac. 734; also *Norton* v. *Brownsville,* 129 U. S. 590, and *Criswell* v. *Montana Central Co.,* 37 L. R. A. 354.

That these and other cases including that of *District of Columbia* v. *Hutton,* 143 U. S. 25, "render impossible the theory that the general provision in the Organic Act saves the statutes of 1904 and 1905." We are also referred in this connection to 90 A. S. R. 430, and 158 S. W. 823.

Seventh, that in a number of cases it has been held that where the charter of a municipal corporation granted the power of appointment to a particular officer, the municipality was powerless by fixing a term to limit the power of removal of the appointing power. Citing *Mathis* v. *Rose,* 44 Atl. 875; *State* v. *Archibald,* 66 N. W. 242, including other cases cited therein; Dillon on Municipal Corporations, sec. 587 (317); *People ex rel. Devery* v. *Coler,* 173 N. Y. 115, 65 N. E. 956; *State* v. *Johnson,* 27 S. W. 399.

Eighth, that "these decisions cannot be regarded as limited to municipal corporations but must be considered as (announcing) general principles of constitutional construction," which is said to be partially evidenced by *State* v. *Kipp,* 74 N. W. 440; that *Higgins* v. *Cole,* cited with approval in *State* v. *Archibald, supra,* "shows that municipal corporations in regard to their powers of appointment are not different from these powers of a governor in his right of appointment and removal," and that *Palliser* v. *Home Telephone Co., supra,* also shows that "municipalities are no different from other government."

We have no quarrel with general principles of constitutional law and statutory construction. Some showing as to the soundness of the premises involved in the application made of such general principles to the instant case would have been more to the point.

For present purposes it may be conceded that "the legislature has only the very slightest control over" the Gov-

ernor and his power of appointment. We are constrained to postpone an accurate delimitation of the scope and extent of this legislative power until the occasion arises, if it ever does, as the result of some overt act on the part of the Legislature indicative of a disposition to assert an appreciable degree of control over the gubernatorial prerogative. "Sufficient unto the day is the evil thereof."

The lack of legislative control over "constitutional officers," in so far as pertinent to any question herein, assumes, without disclosing any adequate basis for the assumption, that a municipal judge in Porto Rico is a constitutional officer. But a constitutional officer has been defined as "any of those officers whose tenure and term of office are fixed and defined by the constitution." And constitutional offices are said to be (italic ours) "offices which, as contradistinguished from legislative or statutory offices, are denominated constitutional, such as are governmental in their nature, as for example the executive, judicial, or legislative offices of the state or any political division thereof. *All these are either created by or provided for* in the constitution, while such offices as are designed for the administration of the affairs of municipalities are ordinarily *created by the legislature.*" 12 C. J. 1294.

"In many if not all of the states certain courts are created by the constitution, and do not depend solely on statutes for their power. Among the most usual classes of tribunals thus created are supreme courts, circuit courts, county courts, criminal courts, district courts, probate courts, and justices' courts. While constitutional provisions vesting the judicial power of the state in certain courts make such courts when organized constitutional tribunals, yet if nothing else existed in the way of constitutional provision or legislative enactment, such courts would have nothing but an imaginary existence, an existence only in legal contemplation, but no real or potential existence. It is by legislative enactment alone that courts with their constituent elements of time, place, and officers, are brought into actual and real existence, as contradistinguished from

their existence solely under constitutional provisions." 7 R. C. L. 977, sec. 6.

See also 7 Ann. Cases, 627, 629; 18 *id.* 199, 200; *id.* 1914C, 1116; 1913C, 1160.

In *Board of Commissioners* v. *Gwin,* 136 Ind. 562, at page 576 the court said:

"These constitutional provisions make the circuit courts, when organized, constitutional tribunals; but if nothing else existed in the way of constitutional provision or legislative enactment, the circuit courts would have nothing but an imaginary existence, an existence only in legal contemplation, but no real potential existence.

"Brown on Jurisdiction says: 'Courts may be established and their jurisdiction defined by the constitution or organic law of the State, or by legislative enactment. Generally, however, jurisdiction proceeds from statutory power granted, except where it is given by the constitution, of which the Supreme Court of the United States is an example; and the statutes prescribe the manner in which the court shall be conducted and the form and procedure, and appoint or provide for the appointment or election of judges and subordinate officers, as well as the method or rules of procedure governing them. There are no courts in this country except those so created.' Brown Juris., section 12.

"In Levey v. Bigelow, supra, the appellate court said: '  *   *   * In modern times, and under our form of government, the judicial power is exercised by means of courts. A court is an instrumentality of government. It is a creation of the law, and in some respects it is an imaginary thing, that exists only in legal contemplation, very similar to a corporation. A time when, a place where, and the persons by whom judicial functions are to be exercised, are essential to complete the idea of a court. It is in its organized aspect, with all these constituent elements of time, place and officers, that completes the idea of a court in the general legal acceptation of the term. But a court may exist in legal contemplation, without any officers charged with the duty of administering justice.'

"It is by legislative enactment alone that these constituent elements of the circuit court of this State have been brought into existence, and thereby the Legislature has called into being the actual and real existence of the circuit courts of this State, as contradis-

tinguished from their existence solely under the constitutional provisions quoted above.''

See also *People ex rel. Ward* v. *Scheu,* 60 App. Div. 594, where *Burby* v. *Howland* again heads a long list of cases cited; *Wisconsin* v. *Duluth,* 30 Fed. Cas. 382, and *United States* v. *Union Pacific R. R. Co.,* 98 U. S. 569, at pp. 602 and 603.

''The power to fix the term of an office is, unless otherwise provided, possessed by the body which under the law may create the office, ordinarily the Legislature. But if the constitution fixes the term of office such term may not be changed by the Legislature.'' 29 Cyc., p. 1396, par. *b.*

At page 835, volume 12, of Corpus Juris it is said that—

''The Legislature cannot interfere with or limit the power conferred on an executive officer by the constitution, but it has the power to make reasonable regulations as to the performance of the duties of a constitutional officer.''

And in a note the following quotation is given as ''the reason for the rule:''

'' 'The mention of an officer in the Constitution does not place him above the law and give him the same control of his office as of his private business. He is a public officer and the business of his office must be conducted according to law. The Legislature may not deprive him of the powers conferred upon him by the Constitution, but it has power to make reasonable regulations in regard to the means by which, and the time, place, and manner in which the duties of such constitutional officer shall be performed.' *People* v. *Brady,* (Ill.) 114 N. E. 25, 27.''

Our Organic Act neither creates municipal courts nor provides for them *eo nomine,* nor does it fix and define the tenure and term of office of municipal judges. It does not even provide for the appointment of municipal judges by name. A provision that judges and other officials of courts ''now established or that may hereafter be established in

Porto Rico'' shall be appointed by the Governor may suffice to convert such courts into constitutional tribunals, but that proposition is not self-evident.

''Where the organic law delegates to the Legislature the power to create, establish, organize, or reorganize courts, to regulate their jurisdiction, or otherwise to legislate concerning them, that body may do so, subject to whatever restrictions or limitations are imposed. The terms in which the constitutions so doing have delegated such power are various, being both general and specific, and these include by necessary implication the exercise of such authority as is essential to effectuate the purposes intended. But whether the constitutional delegation of power is general or specific, restrictive or otherwise, inclusive or exclusive, or discretionary and not exclusive, or whatever may be the nature thereof, the exercise of the power must be governed by the organic law granting or conferring the right. These principles are fundamental; they run through all the decisions and govern statutes relating to inferior courts in general, to county and probate courts, to municipal and police courts, to charter provisions relating to such courts, to courts of equity or chancery in general, to special courts or tribunals, to commissions, to the creation of courts of either exclusive or concurrent jurisdiction, to changing the status of courts, to acts in derogation of constitutional provisions as to appeals, to appellate jurisdiction of particular courts, and to statutes providing or failing to provide for judges or prescribing or regulating the mode of procedure.'' 15 C. J. 859.

When the words ''constitutional officer'' are used with reference to a simple provision for the appointment of certain officials to offices created by the Legislature, with fixed terms and reasonable qualifications as to eligibility, and left as found by the Constitution in so far as not inconsistent therewith entirely subject to legislative control,—is there any weird magic in the phrase that can give such provision as to appointment some undefined, intangible yet vastly superior repealing power that it would not have if contained in a statute? Does the mere vesting of the judicial power ''in courts now established and in operation under and by virtue of existing laws,'' coupled with a grant of legislative au-

thority "to organize, modify or rearrange the courts and their jurisdiction and procedure," not only deprive the Legislature of all power to fix the terms of judicial officers and prescribe reasonable requirements as to eligibility, but also repeal earlier statutes fixing such terms and specifying the usual qualifications as prerequisite to appointment? And does this result inevitably follow, notwithstanding the clause immediately preceding such proviso wherein it is expressly provided that "the jurisdiction of said courts and the form of procedure in them, and the various officers and attachés thereof shall also continue to be as now provided until otherwise provided by law?" Were the earlier statutes abovementioned void *ab initio* by reason of a similar investiture of judicial power under the former Organic Act followed by the proviso that the Legislative Assembly should have authority to legislate from time to time as it might see fit with respect to said courts, and any others that they might deem it advisable to establish, "their organization, the number of judges and officials and attachés for each, their jurisdiction, their procedure, and all other matters affecting them?"

We have had no time for the independent investigation of these matters, but some inquiry along the lines suggested would seem to be pertinent to the question of "constitutional officers" *vel non* in the sense sought to be given to that phrase herein as depriving the Legislature of all but "the very slightest control" over such officers.

The possibility of classifying municipal courts as constitutional courts notwithstanding their statutory origin, and thus putting them, or at least the terms and qualifications of their officers, beyond the control of the Legislature, does not seem to have occurred to counsel for the Governor, and the cases above mentioned do not throw much light on the subject. Our examination of these cases has been of necessity somewhat cursory and some points may have been over-

looked; but we shall refer in passing to those that seem to have any bearing whatever on the question now before us.

What was said by a divided court in *People ex rel. Burby* v. *Howland* should be read in the light of Article VI of the Constitution, and at page 840 we find the following:

"That article establishes the judiciary of the state, the same as previous articles had established the legislative and executive departments of government. By its 17th section it provides that 'the electors of the several towns shall, at their annual town meetings, * * * elect justices of the peace, whose term of office shall be four years. * * * Justices of the peace and judges or justices of inferior courts not of record, and their clerks, may be removed for cause, after due notice and an opportunity of being heard by such courts as are or may be prescribed by law. Justices of the peace and district court justices may be elected in the different cities of this state in such manner, and with such powers, and for such terms, respectively, as are or shall be prescribed by law.' It is provided by sec. 20 of the same article that 'no judicial officer, except justices of the peace, shall receive to his own use any fees or perquisites of office;' by sec. 22, that 'justices of the peace and certain other local judicial officers in office when this article takes effect, shall hold their offices until the expiration of their respective terms;' * * *." 41 L. R. A. 840.

In *State ex rel. Kennedy* v. *Brunet* the court held, to quote the syllabus—

"Where a State constitution provides for the election of sheriffs, fixes the term of office, etc., but does not define what powers, rights and duties shall attach or belong to the office, the Legislature has no power to take from a sheriff a part of the duties and functions usually appertaining to the office, and transfer it to an officer appointed in a different manner and holding the office by a different tenure." 7 Am. Rep. 84.

In *State ex rel. Hovey* v. *Noble,* the third paragraph of the syllabus says that—

"Under the Indiana Constitution, article 7, sec. 1, ordaining that 'The judicial power of the State shall be vested in one supreme

court, in circuit courts, and in such other courts as the General
Assembly may establish,' the Legislature cannot create a supreme
court commission for the transaction of judicial business." 4 L.
R. A. 101.

*State ex rel. Geake* v. *Fox* and *Rathbone* v: *Wirth,* where
*two* members concurred in the result on grounds separately
stated and two others dissented, are interesting cases but
not in point.

The pertinent paragraph of the syllabus to *State ex rel.
Buell* v. *Frear,* reads thus:

"2. The discretion of the appointing officer in making appoint-
ment to office is not unduly restricted by a statute which limits him
to a choice among three names from an eligible list, except in case
of confidential assistants or laborers, as to whom competitive ex-
aminations shall be found impracticable." 34 L. R. R. (N. S.) 481.

And in a note to this case, at page 484, we find the fol-
lowing:

"In People v. Gaffney, 142 App. Div. 122, 126 N. Y. Supp.
1027, affirming 69 Misc. 36, 125 N. Y. Supp. 762, it was held that
the provisions of the New York civil service act which permit the
selection of one from three persons upon the eligible list leaves suffi-
cient power of selection to the appointing power to satisfy the con-
stitutional right of local authorities to select their own subordinates."

"In Rogers v. Buffalo, 123 N. Y. 173, 9 L. R. A. 579, 25 N. E.
274, it was held that the New York civil service law of 1883, by
requiring the mayor of a city to prepare rules for the selection of
the city officers whose appointment has been delegated by the Con-
stitution to the municipal authorities, which must be approved by
the state civil service commission before they can go into effect, does
not subordinate the power of the local authorities to that of the
state authorities, in violation of a constitutional provision delegating
the appointing power to municipal authorities."

What was decided in *State ex rel. Sweet* v. *Cunningham*
is summed up in the syllabus in this wise:

"1. Under Const. art. 10, sec. 2, providing that the proceeds of

all school lands shall be used for the support of schools, the Legislature has no power to set apart any of these lands for a state park.

"2. The Legislature has no power to withhold school lands from sale, Const. art. 10, sec. 8, confiding such power solely to the commissioner of public lands.

"3. Public lands that have been withdrawn from sale are not subject to private sale until they have been reoffered at public sale. Laws 1885, c. 222." 57 N. W. 1119.

We find nothing worth mentioning in *Woods* v. *Vormun.*

The gist of the decision in *Rankin* v. *Jauman* is to be found in the second and third paragraphs of the syllabus, which read thus:

"The constitution makes provision for, and prescribes the proceeding for, the removal or impeachment of state officers for certain misdemeanors; and by section 7459, Rev. St., the legislature has provided for the removal of certain civil officers for the causes named in said section, and has then prescribed the proceedings for the summary removal of those officers who come within its provisions.

"There is no inhibition in the constitution of Idaho prohibiting the legislature from providing a proceeding and tribunal for the summary removal of all civil officers whose removal is not provided for by the constitution, for misdemeanors, incompetency, or corruption in office." 36 Pac. 502.

The first paragraph of the syllabus to *Warner* v. *The People,* reads as follows (italics ours):

"Where the Constitution provides *for the appointment to an office in a particular manner,* the Legislature has no power to create a new office for the performance of the same, or the principal part of the same duties, and to *direct the appointment to be made in another manner."* 17 N. Y. Common Law Rep. 127.

The North Carolina case of *State ex rel. Bickett* v. *Knight* involved the right of a woman to be a notary public and came up from Buncombe County. The judgment below was reversed by a divided court. There is an interesting dissenting opinion by Mr. Chief Justice Clark and the majority opinion is not wholly devoid of local color. It also contains

a clear statement of one reason why we cannot make any exception to the general rule in the instant case. The court quotes first from Disraeli and then from Shakespeare:

" 'A precedent embalms a principle.' If the principle is not safe and sound, we may well adopt the words of Portia, who replied, when urged to do a little wrong that great good might come of it:

" 'Twill be recorded for a precedent;
And many an error, by the same example,
Will rush into the state; it cannot be.' "

           L. R. A. 1915 F, 906.

The cases of *Tel. Co.* v. *Eyser, Luria* v. *United States* and *Higgins* v. *Richards* require no comment.

In *Township* v. *Talcott, supra,* the Supreme Court said in part:

"It is said the act is in conflict with the constitution of the State.

"It is an axiom in American jurisprudence that a statute is not to be pronounced void upon this ground, unless the repugnancy to the constitution be clear, and the conclusion that it exists inevitable. Every doubt is to be resolved in support of the enactment. The particular clause of the constitution must be specified and the act admit of no reasonable construction in harmony with its meaning. The judicial function involving such a result is one of delicacy, and to be exercised always with caution. It must be admitted that the constitution here in question contains nothing directly adverse upon the subject. * * * The case as to the constitution is a proper one for the application of the maxim, *Expressio unius est exclusio alterius.* The instrument is drawn with ability, care and fulness of details. If those who framed it had intended to forbid the granting of such aid by the municipal corporations of the State, as well as by the State itself, it cannot be that they would not have explicitly said so. It is not to be supposed that such a gap was left in their work from oversight or inadvertence. * * * The legislative power of a State extends to everything within the sphere of such power, except as it is restricted by the Federal Constitution or that of the State. In the present case we have found nothing that in our judgment warrants the conclusion that the act in question is wanting

in validity by reason of its unconstitutionality. * * * It does not belong to courts to interpolate constitutional restrictions. Our duty is to apply the law, not to make it. All power may be abused where no safeguards are provided. The remedy in such cases lies with the people, and not with the judiciary." 86 U. S. 673–677.

The case of *Mathis* v. *Rose* hinges primarily upon the proposition that—.

"The city council of 1893 could not by an ordinance limit and restrain the city council of 1899 in respect to powers expressly granted by the legislature. Trowbridge v. Newark, 46 N. J. Law 140." 44 Atl. 877.

Likewise in *State* v. *Archibald:* "The by-laws were passed in 1885 by a board composed of persons different from the present board."

At the threshold of the discussion on the merits the court said (italics ours):.

"That the board of trustees of the asylum had power to remove the superintendent, Dr. Archibald, without cause, without notice, and in the exercise of their own unfettered and unreviewable discretion, cannot admit of doubt, *unless there is something in the by-laws to be hereafter referred to which interferes with that power.*"

Then, without any very apparent necessity for the latter. portion of the quotation that follows, the court went on to say:

"To show that the board intended to strip itself of any portion of this power, explicit language to that effect should be pointed out. So far from there being anything in the words used to evince a purpose to divest itself of its discretion as to the sufficiency and existence of the cause for removal, *the by-laws in terms declare* that the superintendent shall be subject to removal for good and sufficient cause *'at the pleasure of the board.'* They are to judge, finally, of the whole matter. Certainly, they did not, by this language, confer upon the courts the power to inquire into the sufficiency or existence of any cause for removal. They left the power as broad as they found it. Nor could they do otherwise. * * * If the

board may lawfully fix a term of one year, it may likewise give the incumbent a life tenure. If it can, with legal effect, declare that the superintendent can be removed for good and sufficient cause, it may narrow the ground of removal to a particular case, and thus place this portion of the discretion vested in the board for the public welfare beyond the possibility of exercise by succeeding boards for years to come. Thenceforth the board of trustees would, for a season, be shorn of the specified power of appointment, of the incidental power of removal, and to this extent of the power of general control and management granted to it by the statute. Even if the by-laws in question were explicit in their limitation of the power of the board, we would be compelled, for the reasons set forth, to treat them as without effect. The authorities are unanimous in support of this view. State v. Lane (N. J. Sup.) 21 Atl. 302; City of Newark v. Stout (N. J. Sup.) 18 Atl. 943; Williams v. City of Gloucester (Mass.) 19 N. E. 348; Higgins v. Cole (Cal.) 34 Pac. 678; Carter v. City of Durango (Colo. Sup.) 27 S. W. 399; Weidman v. Board of Education, 7 N. Y. Supp. 309.'' 66 Atl. 241, 242.

Whether or not any legislative power had been conferred upon the board does not appear. If not, the correctness of the conclusion reached may be conceded without regard to the merits of the reasoning in support thereof. But, if the board or any other local legislative body had the power expressly conferred by statute to create, to reorganize, to tear down, to build up and to destroy the institution in question, and if the statute had said that ''the various officers and attachés thereof shall also continue to be as now provided,'' and if the term of office of the superintendent had been previously fixed by ordinance,—then the conclusion arrived at would be wholly untenable. In any event, a sufficient answer to the argument may be found in an opinion by Attorney General Akerman, XIII Ops. Atty. G. 576, to which reference will be made later. For the present we are content to say that such an examination as we have been able to make of the cases cited discloses no substantial basis for the broad statement that ''the authorities are unanimous in support

of'' the view taken by the North Dakota court in *State* v. *Archibald.*

The head-notes to *Horan* v. *Lane* read thus:

"1. A common council, being constituted as it will be when a term of office about to expire shall end, and having authority to appoint the successor of the incumbent, may lawfully make such appointment before the expiration of the current term.

2. When a statute empowers the council of a city to appoint to a certain office, an ordinance of the council, which, if enforced against succeeding councils, would defeat or materially impair their power of appointment, is void." 21 Atl. 302.

In *Mayor, Etc., of City of Newark* v. *Stout,* the eleventh paragraph of the syllabus is as follows:

"The city charter provided that certain officers, including the city treasurer, should be appointed from time to time by the common council, and that every person who should be appointed to any office under the provisions of the charter should continue in office until the office for which he should be appointed should be declared vacant, or until another person should be appointed to succeed him, and should enter upon the duties of his office; and that the city treasurer should, before entering on the duties of his office, give bond with sureties for the faithful performance of his duties. S. was appointed treasurer in January, 1867, and continued in office until January, 1875. He gave bond in January, 1867, with sureties, in conformity with the city charter. In an action on this official bond, the sureties pleaded that, by the charter and by the rules and usages of the common council, all the officers appointed by the common council, including the city treasurer, were appointed for one year, subject to removal at pleasure, and, when not reappointed at the expiration of the term, were suffered to hold over at pleasure; and that the defendants executed the said bond as sureties with a knowledge of the said rules and usages of the common council, and on assurances and representations, made on behalf and by authority of the common council and of the plaintiffs, that they would be bound as such only for the term of one year. *Held,* that this plea presented no defense." 18 Atl. 943.

In *Williams* v. *City of Gloucester,* the first two paragraphs of the syllabus say that (italics ours)—

"Under a city charter, providing that the mayor and aldermen shall have power to appoint. police officers, and *to remove them at pleasure,* the power of removal is not confined to officers nominated by the mayor exercising it, but extends to officers nominated by his predecessors, though by another clause the mayor, with the consent of the appointing power, may remove 'any officer over whose appointment he has exercised the power of nomination.'

"Power being given *'to remove at pleasure',* cause shown and a previous hearing are not necessary; and such power given by charter cannot be restrained by ordinance." 19 N. E. 348.

In *Higgins* v. *Cole,* the court said:.

"Appellant contends that ordinance was ultra vires and void, but no constituional provision or statute is cited, and we know of none with which it is in conflict. By the statute under which the city was organized the board of trustees was given power 'to pass ordinances not in conflict with the constitution and laws of this state or of the United States,' (section 764, subd. 1,) and the ordinance in question must therefore be held valid. The ordinance, in effect, provided that the chief should be appointed to hold office for one year, *or until his successor should be appointed and qualified.*

"This, as we understand it, must be construed as declaring only that the term of office shall continue until a successor is elected and qualified, and not necessarily for a full year. And under the statute providing that the trustees may 'appoint *and remove* such policemen and other subordinate officers as they may deem proper,' it would seem that it had no power to limit their· right of removal. The constitution declares: 'When the term of any officer or commissioner is not provided for in this constitution, the term of such officer or commissioner may be declared by law; and, if not so declared, such officer or commissioner shall hold his ·position as such officer or commissioner during the pleasure of the authority making such appointment.' Section 16, art. 20. As the term of office of the chief of the fire department was not fixed by the constitution *nor declared by law,* it must be held that appellant's term continued

only during the pleasure of the appointing power, and that he was rightly removed.'' 34 Pac. 680.

In *Carter* v. *City Council,* we find the following (italics ours) :

''The fact that an ordinance had been adopted by the municipal authorities of Durango providing for the preferment of charges, and a hearing, upon notice, preliminary to removal from office, does not alter the result to which the foregoing conclusions would lead. The council were not bound to supply any specific procedure for the removal of police magistrates. The ordinance in question is general, relating to a number of offices, in some of which removals are not discretionary with that body. It reads: 'Any officer named above may be removed by a majority of the city council for incompetency, or dereliction or violation of duty, whenever the council think the interests of said city require such removal; *Provided,* That no officer shall be removed as aforesaid until he shall have notice of such intent of removal, and the charge or charges preferred against him, served on him by the city clerk, and an opportunity to exculpate himself before the city council. * * * We cannot assume that in adopting this ordinance the councilmen intended to curtail their statutory power of removing at pleasure, and limit themselves to removals for the specified causes alone. *Besides, it is extremely doubtful if such intent, had it existed,* could be thus given any force or effect; for it is not within the power of a municipal corporation by ordinance or by-law either to extend or restrict the authority conferred by statute. I Dill. Mun. Corp. sec. 317. It will be observed that the procedure specified in the ordinance above mentioned is limited to removals for 'incompetency' or 'dereliction or violation of duty.' We are not apprised by the record that Carter was removed upon either of these grounds. The sole action through which his removal was ultimately accomplished was the following: 'Resolved, that it is no longer the pleasure of the city council of the city of Durango that Robert Carter act in the capacity of police magistrate of said city of Durango; wherefore, be it resolved, that the said Robert Carter be, and he is hereby, removed from the said office of police magistrate.' *We might, perhaps,* with the learned judge before whom this precise question was first raised, declare that the ordinance cannot be permitted under any circumstances to control the manner of expressing the 'pleasure'

vested by statute in the city council; *but it is sufficient for us to say that the removal may have been upon grounds not mentioned in the ordinance,* and, if such were the case, the question of duty or obligation to follow the prescribed procedure *does not fairly arise."* 27 Pac. 1058.

The Supreme Court of Missouri in *State* v. *Johnson* is not so cautious, and, without assigning any reason for extending the doctrine of the cases cited as authority for the bald statement of the conclusion arrived at, says:

"The provision in the ordinance to the effect that the chief of the fire department could only be removed for cause is inconsistent with the broad and general power, conferred by the charter, to appoint at pleasure, and by implication, at least, to remove in the same way. In Williams v. City of Gloucester, 148 Mass. 256, 19 N. E. 348, it is held that an ordinance of the city of Boston limiting the power of removal 'at pleasure' to removal 'for cause,' was repugnant to the statute. See, also, Stadler v. City of Detroit, 13 Mich. 346; Vason v. City of Augusta, 38 Ga. 542; State v. Lane, 53 N. J. Law, 275, 21 Atl. 302. *Moreover, the ordinance provides that the mayor and council shall appoint the chief engineer, while, under the charter, the appointment can only be made by the common council, the mayor having nothing whatever to do with it, and it is in this respect also repugnant to the statute. No such power, or any part of it, could be conferred on the mayor by ordinance, under the statute.* 1 Dill. Mun. Corp. sec. 207, p. 289; Newark v. Sout, 52 N. J. Law, 35 18 Atl. 943; Day v. Green, 4 Cush. 433; Beach, Pub. Corp. sec. 147. It will thus be seen that the relator held his position at the pleasure of the appointing power, subject to removal at any time, unless the term of his office is fixed or limited to a certain time by some provision of the constitution of the state. *People* v. *Robb* (N. Y. App.) 27 N. E. 267." 27 S. W. 400.

The quotation from the Massachusetts case first mentioned would suffice to show that it does not sustain the proposition as stated, but see also the syllabus, *supra.*

The head-notes to *Stadler* v. *City of Detroit* are as follows:

"The term of the office of marshal for the city of Detroit as fixed by section 13, chapter 2, of the amended charter (Laws of 1861, p. 181–2), is two years, and this term is not abridged or affected by the provision of section 2 of the same chapter.

"Under said amended charter, S. was appointed by the common council of the city to the office of marshal for one year, and gave a bond in which his appointment for that time was recited. At the expiration of the year, the counsel (*sic*), without his consent, or in terms, removing him, appointed another to the office, who entered upon and performed its duties. In an action brought by S. to recover his salary as marshal for the second year, *held,* that by virtue of his appointment, S. was entitled to hold the office for two years, and to receive the salary for the full term; that the recital in said bond of an appointment for one year was surplusage, and the bond was valid for the full term; and that the appointment of another to the office was not equivalent to the removal of S. and did not divest him of the office." 13 Mich. 346.

We do not have access to the Georgia case. The headnotes to *State* v. *Lane* are set forth *supra.*

In *People* v. *Robb* the New York Court of Appeals said (italics ours):

"With respect to the tenure or duration of a public employment, such as the relator had at the time of his dismissal, the general rule is that where the power of appointment is conferred in general terms, and without restriction, the power of removal, in the discretion and at the will of the appointing power, is implied and always exists, *unless restrained and limited by some other provision of law.* People v. Fire Commissioners, 73 N. Y. 437; Bergen v. Powell, 94 N. Y. 591; Ex parte Hennen, 13 Pet. 230; Laimbeer v. Mayor, etc., 4 Sandf. 109; Avery v. Inhabitants of Tyringham, 3 Mass. 177; Blake v. U. S., 103 U. S. 277; People v. Thompson, 94 N. Y. 451; People v. Mayor, etc., 5 Barb. 43.

"*This general rule was embodied in the constitution of this state in the following language:* 'When the duration of any office is not provided by the constitution, *it may be declared by law,* and, *if not so declared,* such office shall be held during the pleasure of the authority making the appointment.'" 27 N. E. 267.

In *Weidman* v. *Board of Education,* the court referring

to the board pointed out that: "One of their specified powers is, 'to contract with and employ all teachers in the said school under their charge, and, also, a janitor and librarian, and at their pleasure to remove them.'"

Again:

"If, as is contended by the plaintiff, the service to be performed by him was under a special contract with the board stipulating his duties and labors and the compensation to be paid therefore, and that in no sense whatever was he holding a public place or office, then the same result must follow, for by the terms of the agreement the defendant reserved the right to terminate the agreement at the will of the board of managers." 4 Silvernail, 240, 242.

In *People* v. *Coler* the opinion by Cullen, J., contains the following:

"The Constitution deals with substance, not merely with form. When it provides that the officer shall be elected by the electors of the locality or appointed by some local authority, its mandate is that the office shall be filled and held solely by virtue of such election or appointment. An absolute power of removal in the governor is inconsistent with such a tenure. The question before us is very different from that which would be presented by a provision that the governor might remove for misconduct in office after a notice and a hearing. The Constitution, by section 8 of article 10, provides that 'The legislature may declare the cases in which any office shall be deemed vacant when no provision is made for that purpose in this Constitution.' The legislature has exercised this authority by laws of a general character and enacted that the removal of the residence of a local officer without the locality for which he was elected, the conviction of an officer of a crime involving a violation of his oath of office, or his conviction of a felony of whatever character renders the office vacant. The validity of the statutory provisions has never been challenged. I am not prepared to assert that a statute authorizing the governor to remove a local officer for misconduct on charges and after a hearing could not be justified under the section of the Constitution quoted." N. Y. Court of Appeals, Book XXXV, p. 573.

*State* v. *Kipp* involved an act of the Legislature entitled

"An Act to provide for the creation of the office of commissioner of insurance, and defining the duties thereof." Section 3, in so far as pertinent, and section 4 of the State Constitution read as follows:

"Sec. 3. The governor and other state and judicial officers except county judges, justices of the peace, and police magistrates, shall be liable to impeachment for drunkenness, crime, corrupt conduct, or malfeasance or misdemeanor in office; * * *.

"Sec. 4. All officers not liable to impeachment shall be subject to removal for misconduct, malfeasance or crime or misdemeanor in office or for drunkenness or gross incompetency, in such manner as may be provided by law." 74 N. W. 441.

The court said in part (italics ours):

"The rule of law is well settled that, except when the constitution has imposed limits or restraints upon legislative power, it must be considered as practically absolute; and a legislative act, which does not encroach upon the powers apportioned to the other departments of the government, must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution itself, or arise by *necessary* implication from some provisions of that instrument. * * * We are of the opinion that there is not any such *necessary* implication. The framers of the constitution had *provided* in that instrument for all the state and judicial officers that they deemed necessary for the proper organization of the new state; and it is but reasonable to assume that by the expression 'all other state and judicial officers,' found in section 3, they referred to such officers only as they had *created and* named in that instrument. * * * What has been said with reference to section 3 applies with equal force to section 4. The constitution not only *provided for* the necessary state officers, but it also *provided for* the usual county officers (section 5, art. 9), and provided for their election by the people. The term 'all officers,' specified in section 4 as not liable to impeachment, was, we think, clearly intended to mean county officers and such officers as were not, strictly speaking, state officers, but yet were designated in the constitution. Thus, we have a class of state officers only removable for cause, but in such manner as may be provided by law; and a large class of township, municipal, district officers, and officers

*created by the legislature* whose tenure of office and manner of removal are entirely within the control of the legislative power." *Id.,* p. 442.

We have already quoted from *Higgins* v. *Cole* enough to show that the provision of the California code referred to is identical with that of New York said in *People* v. *Robb, supra,* to be a paraphrase of the general rule: "Where the power of appointment is conferred in general terms, and without restriction, the power of removal, in the discretion and at the will of the appointing power, is implied and always exists, *unless restricted and limited* by some other provision *of law.*" The two cases are not in conflict upon this point. In the *Higgins Case* the trustees were expressly authorized by statute to "appoint *and remove*" policemen, and the ordinance did not undertake to regulate or place any restrictions or limitations upon such express power of removal, but provided in substance for a tenure of one year, unless, "or until," a "successor should be appointed and qualified." No question of an implied power of removal was involved. What legislative authority if any in regard to the creation of municipal offices had been conferred upon the board of trustees does not appear. In the circumstances, the showing made by this case to the effect that "these decisions cannot be regarded as limited to municipal corporations but as general principles of constitutional construction" is not very satisfactory.

*Palliser* v. *Home Telephone Co., supra,* simply quotes or rather misquotes, from *Kepner* v. *United States,* 195 U. S. 100, as follows:

" 'It is a well-settled principle of construction that specific terms covering the given specific matter will prevail over general terms in the same or another statute which might otherwise prove controlling.' " 44 So. 578.

We are not disposed to dispute this statement as an ab-

stract proposition, but the conclusion that "municipalities are no different from other government" can hardly be regarded as a corollary thereto.

Nor do we find in *Higgins* v. *Cole, supra,* any very persuasive showing that "municipal corporations, in regard to their powers of appointment, are no different from the powers of a governor in his right of appointment and removal.

Coming now to the argument of counsel for the Governor, we find in *Wallace* v. *United States,* decided February 27, 1922, the latest expression from the Supreme Court, which, speaking through Mr. Chief Justice Taft, says (italics ours):

"Before the Civil War there was no restriction upon the President's power to remove an officer of the Army or Navy. The principle that the power of removal was incident to the power of appointment was early determined by the Senate to involve the conclusion that, at least *in absence of restrictive legislation,* the President, though he could not appoint without the consent of the Senate, could remove without such consent in the case of any officer whose tenure was not fixed by the Constitution. The first legislative restriction upon this power was enacted March 3, 1865, by the very provision we are here considering (13 Stat. 489), which subsequently became Section 1250 Revised Statutes. Thereafter on July 17, 1866, Congress took away altogether the power of the President to dismiss an officer of the Army or Navy in time of peace, except in pursuance of a court martial sentence or in commutation thereof. After that, in the controversy between President Johnson and the Senate, the tenure of office act was passed which cut down the power of the President to remove civil officers. Act of March 2, 1867, 14 Stat. 430. *The validity of these acts has never been directly passed on by this court in any case. The question has been expressly saved.* Parsons v. The United States, 167 U. S. 324, 339."

An extract from *Mullan* v. *United States,* 140 U. S. 240, cited in the paragraph following the above quotation, will suffice to show that the Supreme Court did not mean to say and did not hold in the *Wallace Case* that Congress had no power to place any restrictions or limitations whatsoever upon the presidential power of removal as an incident to the

power of appointment, even when such power of removal is not exercised by the President alone, but "by and with the advice and consent of the Senate." The gist of what the court said in *Mullan* v. *United States*, in so far as pertinent to the question, follows (italics ours):

"In Blake v. United States, 103 U. S. 227, 235, it was held, upon full consideration, that the fifth section of the army appropriation act of July 13, 1866, c. 176, 14 Stat. 92, above quoted, *meant*, 'that whereas, under the act of July 17, 1862, as well as before its passage, *the President alone* was authorized to dismiss an army or naval officer from the service for any cause which, in his judgment, either rendered such officer unsuitable for or whose dismissal would promote, the public service, *he alone shall not*, thereafter, in time of peace, exercise such power of dismissal, except in pursuance of a court martial sentence to that effect or in commutation thereof.' Again, in the same case: 'Our conclusion is that *there was no purpose*, by the fifth section of the act of July 13, 1866, to withdraw from the President the power, with the advice and consent of the Senate, to supersede an officer in the military or naval service by the appointment of some one in his place. If the power of the President and Senate, in this regard, could be constitutionally subjected to restrictions by statute, (*as to which we express no opinion*) it is sufficient for the present case to say that Congress *did not intend* by that section to impose them. It is, in substance and effect, nothing more than a declaration that the power heretofore exercised by the President, without the concurrence of the Senate, of summarily dismissing or discharging officers of the Army or Navy, whenever in his judgment the interest of the service required it to be done, shall not exist, or be exercised, in time of peace, except in pursuance of the sentence of a court martial, or in commutation thereof. *There was*, as we think, *no intention* to deny or restrict the power of the President, by and with the advice and consent of the Senate, to displace them by the appointment of others in their places.'

"These principles were affirmed in the subsequent case of Keyes v. United States, 109, U. S. 336, 339." 140 U. S. 245, 246.

Mr. Justice Brandeis, speaking for the court in *Burnap* v. *United States*, 252 U. S. 512, and discussing "the general rules of law governing appointment and removal in the Civil Service

of the United States," at page 515, says that "The power to re-
move is, in the absence of statutory provision to the contrary,
an incident of the power to appoint. *Ex parte Hennen,* 13
Pet. 230, 259, 260; *Blake* v. *United States,* 103 U. S. 227, 231;
*United States* v. *Allred,* 155 U. S. 591, 594; *Keim* v. *United
States,* 177 U. S. 290, 293, 294; *Regan* v. *United States,* 182
U. S. 419, 426; *Shurtleff* v. *United States,* 189 U. S. 311, 316.
And the power of suspension is an incident of the power of
removal."

The leading case is *Ex parte Hennen,* decided in January
1839. Hennen, a clerk of the United States District Court
for the Eastern District of Louisiana, was removed by the
judge, not on account of any misconduct, but merely by reason
of the desire of the judge to make provision for a personal
friend who was appointed to the vacancy.

In argument, counsel for Hennen submitted, among other
things, that "powers are only implied from necessity. If no
cogent reason exist why that which is not in expressed terms
granted should yet pass by implication, such a construction
is not to be favored."

The court does not controvert this proposition, but rather
adopts the point of view so suggested; and, proceeding along
the same line of thought, bases the doctrine of an implied
power of removal squarely upon the necessity of choosing
between the theory of its existence as an incident to the
power of appointment and the imputation of an intention, re-
jected as impossible, to confer upon the incumbent a life
tenure, a necessity arising from the absence of all constitu-
tional provision or statutory regulation. Then, after an his-
torical sketch and brief discussion of the settled usage and
practical construction of the constitution and laws, and after a
reference to the attitude of the English courts toward cases
not governed by ancient usage, wherein "the tenure of the
office is determined by the meaning and the intention of
the statute," the opinion proceeds to show that in the state

courts also "the same rule" prevails and "the questions have been governed by the construction given to the constitution and laws of the state where they arose." Thus, we are told that in *Avery* v. *Inhabitants of Tyringham,* 3 Mass. 177, it is laid down as a general rule "that an office is held at the will of either party; unless a different tenure is expressed in the appointment, or is implied by the nature of the office or results from ancient usage." Whereupon the *Hennen Case* is distinguished in this wise: "The office held by the petitioner clearly falls within neither of these exceptions and of course comes within the general rule, and is held at the will of either party. The petitioner would doubtless claim the right to resign the clerkship if he choose so to do. And the court had a right to put an end to it, at its election." So also, citing *Commonwealth* v. *Southerland,* 3 Seg. & Rawle, 145, the Supreme Court of Pennsylvania is said to have recognized "the principle, that the power of removal was incident to the power of appointment, in the absence of all constitutional or legislative provision on the subject." Again, *Hoke* v. *Henderson* (N. C.), 4 Dev. 1, said to be not at all in conflict with the others mentioned, is thus distinguished: "That case, like the others, turned upon the constitution and laws of North Carolina; and by the express terms of the law, the tenure of the office was during good behaviour; and was, of course, governed by very different considerations from those which apply to the case now before the court."

These are the circumstances in which the court said: "The law giving the district courts the power of appointing their own clerks, does not prescribe any form in which this should be done. The petitioner alleges, that he has heard and believes that Judge Lawrence did, on the 18th day of May, 1838, execute and deliver to John Winthrop, a commission or appointment as clerk of the district court for the eastern district of Louisiana, and that he entered upon the duties of the office, and was recognized by the judge as the only legal

clerk of the district court.   And in addition to this, notice was given by the judge to the petitioner, of his removal from the office of clerk, and the appointment of Winthrop in his place; all of which was amply sufficient, if the office was held at the discretion of the court.   The power vested in the court was a continuing power; and the mere appointment of a successor would, *per se,* be a removal of the prior incumbent, so far, at least, as his rights were concerned."

Attorney General Legaré, in Randolph's case, 1842, Opinions Attorney General, IV, page 1, reached the conclusion that—

"The President of the United States possesses the power to cause a military officer to be stricken from the rolls, without a trial, by a court-martial, notwithstanding a decision in his favor by a court of inquiry ordered for the investigation of his conduct.

"It is an absolute and tremendous power incidental to the Executive of the government, who is only responsible to the country for a breach of the solemn trust."

The opinion, which is extremely brief, does not mention the *Hennen Case,* and, regardless of what the writer might have thought of the "power" of removal from office, if the subject were *res integra,* is based upon the ground that it was even then "too late to dispute the settled construction of 1879," that the power of removal was "according to that construction, from the very nature of the executive power, absolute in the President, subject only to his responsibility to the country," and that "In England, the royal prerogative may be exercised, on all occasions, in dismissing officers from the service, without putting then to the form of a trial."

That Mr. Legaré found no insuperable incompatibility between the existence of this "absolute and tremendous power" as incidental to the executive power of appointment, in the absence of statutory regulation, and a coexistent power in Congress within reasonable limits to prescribe the manner or circumstances in which such executive power should be

exercised, is reasonably apparent from the following extract from another opinion by the same officer a year later (4 Opinions Attorney General 162) in regard to the appointment and removal of inspectors of customs (italics ours): "My own opinion on the points now propounded is, notwithstanding, entirely decided. I think Congress has no power whatever to *vest the appointment* of any employee coming fairly within the definition of an inferior officer of the government, *in any other public authority* but the President, the heads of departments, or the judicial tribunals.

"But may they not vest the appointment in either of these, *to be exercised in a certain manner, with certain precautions or limitations, for a certain term, etc.? I think they may.*"

A few years later, passing upon the claim of a surgeon in the navy for back pay (4 Opinions Attorney General, 603), Attorney General Clifford said (italics ours):

"The authority of the President in this respect was sustained in the debate of 1789 upon the ground that 'it resulted from the nature of the power, and the convenience and even necessity of its exercise; that it was clearly in its nature a part of the executive power, and was indispensable for a due execution of the laws and a regular administration of the public affairs. This doctrine has since been expressly sanctioned by the unanimous judgment of the Supreme Court, *placing it,* however, *more distinctly on the ground* that, *as a necessary rule,* 'the power of removal is an incident of the power of appointment.' (13 Pet., 259.)

"The reasoning of the court in the case cited will shed much light upon the general question involved in this case. Mr. Justice Thompson, in delivering the opinion, says: 'All offices, the tenure of which is not fixed by the constitution *or limited by law,* must be held either during good behaviour or (which is the same thing in contemplation of law) during the life of the incumbent, or must be held at the will and discretion of some department of the government, and subject to removal at pleasure.' It cannot for a moment be admitted that it was the intention of the constitution that those offices which are denominated 'inferior offices' should be held during life; and if removable at pleasure, by whom is such removal to be

made? In the absence of all constitutional provision *or statutory regulation,* it would seem to be a sound and *necessary* rule to consider the power of removal as incident to the power of appointment. And such would appear to have been the legislative construction of the constitution; for in the organization of the three great departments of State, War and Treasury, in the year 1739, provision is made for a subordinate officer to be head of the department, who should have the charge and custody of the records, books, and papers appertaining to the office, when the head of the department should be removed from the office by the President of the United States. When the Navy Department was established, in the year 1798, (1 *Story,* 498,) provision was made for the charge of the books, records, and documents of the department, in case of vacancy in the office of Secretary, by removal or otherwise.

"The form of a military commission in general use expressly describes the tenure of office, and very clearly recognizes the doctrine of 1789: 'This commission to continue in force during the pleasure of the President of the United States for the time being.' "

In 1851 application was made to the President to remove from office the Chief Justice of the Territory of Minnesota "for very serious charges of incapacity, unfitness and want of moral character."

The President thereupon requested an opinion from the Attorney General as to the power of removal and the opinion by Mr. Crittenden (Vol. 5 Opinions of Attorney General) reads in part as follows (italics ours):

"The Act of Congress under which he was appointed enacts, in section 9, 'that the judicial power of the said Territory shall be vested in a supreme court, district courts, probate courts, and justices of the peace. The Supreme Court shall consist of a chief justice and two associate justices, * * * and they shall hold their offices during the period of four years.' And in section 11, it is further enacted 'that the governor, secretary, chief justice, and associate justices, attorney, and marshal, shall be nominated, and, by and with the advice and consent of the Senate, appointed by the President of the United States.' Upon the face of this statute, the appointment of these territorial judges was not for life, nor during good behaviour, but for the term of four years only.

"Not being constitutional courts, and the judges not coming within the third article of the constitution respecting the judicial power and the tenure during good behaviour, the question is, by what tenure of office do these territorial judges hold? *Is there no mode of removing them from office but by impeachment by the House of Representatives for, and conviction by the Senate of, treason, bribery, or other high crimes and misdemeanors.* Being civil officers, appointed by the President, by and with the advice and consent of the Senate, and commissioned by the President, they are not excepted from that *executive power* which, by the constitution, is vested in the President of the United States over all civil officers appointed by him; and whose tenures of office are not made by the constitution itself more stable than during the pleasure of the President of the United States.

  ※    ※    ※    ※    ※    ※    ※

"From this power the judges appointed for the Territories of the United States are not excepted. That these territorial judges were appointed under a law which *limited* their commissions to the term of four years, does by no means imply that they shall continue in office during that term, *howsoever they may misbehave.* An express declaration in the statute that they *should not,* during the term, *be removed* from office, *would have been* in conflict with the constitution, and *would have precluded* either the House of Representatives or the President from the excercise of their respective powers of impeachment or removal. *The law intended no more than* that these officers should certainly, at the end of that term, be either out of office, or subjected again to the scrutiny of the Senate upon a renomination.

"*When it is proposed that this power of removal shall be exerted upon a judge appointed for the administration of justice* to the people of a territorial government, *it must be admitted that caution and circumspection should be used.* But the power of removal is vested by the constitution in the President of the United States to promote the public welfare, to enable him to take care that the laws be faithfully executed, to make him responsible if he suffers those to remain in office *who are manifestly unfit* and *unworthy of public confidence.*"

If the Supreme Court had announced prior to 1851, as it did announce a half century later, that "where the term of office is for a fixed period notice and hearing are essential,"

obviously Mr. Crittenden would have had little or no hesitation about adopting that view of the matter.

An opinion rendered by Attorney General Cushing in 1853 (6 Opinions Attorney General, 4) contains the following:

"Conceding, however, that military storekeepers are officers, or at least, quasi-officers, of the Army, it does not follow that they are not subject to be deprived of their commission at the will of the President.

"I am not aware of any ground of distinction in this respect so far as regards the strict question of law, between officers of the Army and any other officers of the Government. As a general rule, with exception of judicial officers only, they all hold their commissions by the same tenure in this respect. Reasons of a special nature may be deemed to exist, why the rule should not be applied to military, in the same way it is to civil, officers; but the legal applicability to both classes of officers is, it is conceived, the settled construction of the Constitution. It is no answer to this doctrine to say that officers of the Army are subject to be deprived of their commissions by the decision of a court martial. So are civil officers by impeachment. The difference between the two cases is in the form and mode of trial, not in the principle, which leaves unimpaired, in both cases alike, the whole constitutional power of the President.

"It seems unnecessary, in this case, to recapitulate in detail the elements of constitutional construction and historical induction by which this doctrine has been established as the public law of the United States. I observe only that, so far as regards the question of abstract power, I know of nothing essential in the grounds of legal conclusion, which have been so thoroughly explored at different times in respect of civil officers, which does not apply to officers of the Army."

Another opinion by the same officer (Vol. 8 Opinions Attorney General, 223) goes somewhat further, perhaps, although the pertinent portion thereof ends with the following paragraph (italics ours):

"In the case before me, the act of Congress itself seems to have disposed of the question, by directing the dismissal of certain officers of the Navy. If it could be conceded, for the argument's sake, that

the Constitution does not make officers of the Navy removable by
the President, certain it still would be that the Constitution does not
make them irremovable. *They are not constitutional officers by name.
They are of the constitutional class of officers, whose existence is
to be 'established by law,'—the power to do which, in this case, being
comprised in the powers to declare war, and to provide and maintain
a navy, and the power to make all laws, which shall be necessary and
proper for carrying into execution those powers. Of course, their
tenure of office may be the subject of legislation in common with
that of many legislative officers in other branches of the public service.
So that the doubts of the power of the President, on general grounds,
do not apply to the dismissal made by the President in execution of
the present act of Congress."*

In the case of Major Belger (1868), 12 Opinions Attorney
General, 421: "His term of office was during the pleasure of
the President for the time being, and such was the tenor of
his commission." The opinion by Attorney General Brown-
ing contains the following (italics ours):

"The authority of the President to dismiss an officer from the
military or naval service has been fully and elaborately considered
by several Attorneys General. They have, in every instance where
the question arose, asserted that the authority was sanctioned by the
*settled construction* of that instrument and the *uniform practice of
the executive branch of the Government.*

  *         *         *         *         *         *         *

"At the date of Colonel Belgor's dismissal, there was not only
no attempt by Congress to impose any restriction upon the Presi-
dent's discretional power of removal but the existence of the power
was, to the fullest extent, distinctly recognized. In the last clause
of the 11th Article of War are the words, 'nor shall a commissioned
officer be discharged the service but *by order of the President* of the
United States, or by sentence of a court martial.'

"By the 17th section of the act of July 17, 1862, (12 Stats., 596,)
the President of the United States was *authorized and requested* to
dismiss and discharge from the military service, either in the army,
navy, marine corps, or volunteer force in the United States service,
any officer for any cause which, in his judgment, either renders such
officer unsuitable for, or whose dismissal would promote the public
service.'

"The provision did not, in my opinion, clothe the President with a new power, but gave *an express legislative sanction* to the exercise of a power *incident to the high official trust* confided to him.

"He was requested to deprive any officer of his commission whenever the interests of the service would, in his judgment, be thereby promoted. Those who deny that the power of removal is incident to the qualified power of appointment, with which the President is invested by the Constitution, must certainly concede that the terms *'authorized and requested,'* found in the act of 1862, confer upon him and unlimited discretionary authority in the premises.

"At the period in question, therefore, the President had the power, *whether derived from the Constitution or conferred by legislative grant,* to dismiss an officer from the military service of the United States."

In August 1868 Attorney General Evarts in an opinion furnished the Secretary of the Treasurer (12 Opinions of Attorney General, 445) said (italics ours):

"The purpose of the 'tenure-of-civil-office act' was to change the doctrine and practice of the Government, by which removal from office, at the mere discretion of the President, had been established as a proper, and, as had been thought, a necessary, attendant of the executive duty and responsibility, under the Constitution, to maintain the efficiency and fidelity of the public service in fulfilling the manifold and incessant obligations of administration and in execution of the laws. This purpose, *which might have been limited to a requirement of the concurrence of the Senate with the Executive in effecting a removal from office, and yet left the capacity of removal, as a separate and independent act, open to the exigencies of the public service, has been carried by the law to the extent of precluding a termination of the officer's hold upon his office by the united will of the Executive and of the Senate, except by the sole and specific mode* of the appointment, confirmation, and qualification of a successor. This firm hold upon an office into which he shall once have been inducted is put distinctly by the act as a matter of the officer's right and title. The consequence of this is, that there is no other possible mode of vacating the office, thus protected, against the will of the officer, during the session of the Senate, however flagitious and injurious his personal or official conduct may be, except through the constitutional process of impeachment. During the recess of the

Senate, the remedial proceeding of temporary suspension for cause by the Executive, followed by accusation to the Senate, its judgment thereon is provided and may result in the removal of the officer without the necessity of the simultaneous appointment, confirmation, and qualification of his successor.

"The language of the section, securing this right and title to the office-holder, is too clear to admit of doubt:

" 'That every person holding any civil office, to which he has been appointed by and with the advice and consent of the Senate, and every person who shall hereafter be appointed to any such office, and shall become duly qualified to act therein, is and shall be entitled to hold such office until a successor shall have been in like manner appointed and duly qualified, except as herein otherwise provided.'

"Mr. Rollins, then, at the date of his letter to the President, was entitled to hold the office of Commissioner of Internal Revenue until a successor should have been appointed, by and with the advice and consent of the Senate, and should have qualified. And the only interruption of this his personal right, possible under this law, was the general process of impeachment and judgment thereon, or the special proceedings of suspension, accusation, and judgment thereon, provided by the act itself, and which obviously partake of the nature of impeachment.

*       *.       *       *       *       *       *

"I have disposed of the matter submitted to me wholly within the premises of the existing legislation governing the question, and without any discussion of the larger topics touching the conformity or repugnance of this legislation with the Constitution, for no such discussion would be appropriate to the inquiries to which you have called my attention."

In volume 13, page 419, Attorney General Akerman, speaking of the tenure of office of a register of wills for the District of Columbia, said (italics ours) :

"The President has the power, by and with the advice and consent of the Senate, to appoint all officers of the United States whose appointments are not otherwise provided for. (Constitution of the United States, Art. II, section 2.) There being no other provision by law for the appointment of register of wills, the appointment is with the President, with the advice and consent of the Senate, and

the tenure of the office is the President's pleasure, *under the modification prescribed by recent acts known as the tenure of office acts."*

In the same volume, pages 516 *et seq.*, Mr. Akerman, dealing with certain questions "presented by the body known as the Civil Service Commission," held, as outlined in the syllabus, that—

"The power of appointment conferred by the Constitution is a substantial and not merely a nominal function, and the judgment and will of the constitutional depositary of that power should alone be exercised or have legal operation in filling offices created by law.

"The right of Congress to prescribe qualifications for office is limited by the necessity of leaving scope for the judgment and will of the person or body in whom the Constitution vests the power of appointment.

"Congress may, at its pleasure, distribute the appointment of inferior officers between the President, courts of law, and heads of Departments, or confide the same exclusively to one or more of these depositaries; but it cannot constitutionally vest such appointment elsewhere, directly or indirectly.

"Accordingly, an act requiring the President, the courts, and heads of Department to appoint to office the persons designated by an examining board as the fittest would be at variance with the Constitution, inasmuch as it would virtually place the power of appointment in that board.

"But though the result of an examination before such a board cannot be made legally conclusive upon the appointing power, against its own judgment and will, yet it may be resorted to in order to inform the conscience of that power.

"And notwithstanding that the appointing power alone can designate an individual for an office, still, either Congress, by direct legislation, or the President, by authority derived from Congress, can prescribe qualifications, and require that the designation shall be out of a class of persons ascertained by proper tests to have those qualifications."

The opinion concludes thus:

"The other question proposed by the commissioners is this:

"'May the President, under the act by which this board is organized, regulate the exercise of the appointing power now vested in

the heads of Departments, or in the courts of law, so as to restrict appointments to a class of person whose qualifications or fitness shall have been determined by an examination instituted independent of the appointing power?' My opinion is that he may. Though the appointing power alone can designate an individual for an office, either Congress, by direct legislation, or the President, by authority derived from Congress, can prescribe qualifications, and require that the designation shall be made out of a class of persons ascertained by proper tests to have those qualifications; and it is not necessary that the judges in the tests should be chosen by the appointing power. Attorney-General Legaré has given an opinion upon a question similar in principle. Discussing the subject of appointment of inspectors of customs by the Secretary of the Treasury, he considers that it would 'be a fair constitutional exercise of the power of Congress to require that the Secretary should make an appointment out of a certain number of nominees proposed by a collector,' (4 Opinions, 166). The act under which the present civil service commission has been organized gives the President authority 'to prescribe such rules and regulations for the admission of persons into the civil service of the United States as will best promote the efficiency thereof,' and this very ample authority will certainly embrace the right to require that the persons admitted into the service shall have been found qualified by competent examiners.

"It has been argued that a right in Congress to limit in the least the field of selection, implies a right to carry on the contracting process to the designation of a particular individual. But I do not think this a fair conclusion. Congress could require that officers shall be of American citizenship, or of a certain age, that judges should be of the legal profession and of a certain standing in the profession, and still leave room to the appointing power for the exercise of its own judgment and will; and I am not prepared to affirm that to go further, and require that the selection shall be made from persons found by an examining board to be qualified in such particulars as diligence, scholarship, integrity, good manners and attachment to the Government, would impose an unconstitutional limitation on the appointing power. It would still have a reasonable scope for its own judgment and will. But it may be asked, at what point must the contracting process stop. I confess my inability to answer. But the difficulty of drawing a line between such limitations as are, and such as are not, allowed by the Constitution, is no proof that both classes do no exist. In constitutional and legal inquiries,

right or wrong is often a question of degree. Yet it is impossible to tell precisely where in the scale right ceases and wrong begins. Questions of excessive bail, cruel punishments, excessive damages, and reasonable doubts are familiar instances. In the matter now in question, it is not supposable that Congress or the President would require of candidates for office qualifications unattainable by a sufficient number to afford ample room for choice.''

Volume 14 Opinions Attorney General, at page 164, contains an instructive opinion as to appointments and promotions in the Army by Attorney General Williams from which, omitting some half dozen pages of historical data, we quote:

''Respecting promotions in the Army, I have been unable, after careful examination, to find a single instance, where the power of Congress to prescribe the rule therefor has been even doubted. But in filling original vacancies, or offices in the Army newly created, the opinion was advanced by President Monroe, in a message to the Senate dated April 12, 1822, that 'Congress had no right, under the Constitution, to impose any restraint by law on the power granted to the President, so as to prevent his making a free selection of proper persons for these offices from the whole body of his fellow-citizens.' The Senate, however, disagreed with that opinion, maintaining that, as the Constitution conferred upon Congress power to 'make rules for the government and regulation of' the Army, that body had a right to make any which it thought would benefit the public service, and to fix the rule both as to promotions and appointments in the Army. (See Vol. 22, Nile's Reg., pp. 411 to 418; also Story on Const. vol. 2, p. 339, note 3).''

The opinion by Attorney General Davis dated January the 8th, 1878 (Vol. 15 Opinions Attorney General 421) simply held, as stated in the syllabus:

''The President had, in 1861, power to dismiss from the service an officer of the Marine Corps.

''*Semble* that section 17, act of July 17, 1862, chap. 200, in so far as it authorized dismissals by the President from the military service, was declaratory only of long established law, and that the force of the provision is found in the word 'requested', by which it

was intended to re-enforce strongly this power in the hands of the President at a great crisis.''

''Nor,'' says the author in the body of the opinion, ''do I think that the subsequent acts, by which the power of the President to dismiss has been limited, have any tendency to show that he did not possess the power in 1861 to dismiss an officer upon his own responsibility.''

In 1884, Volume 18, page 25, Attorney General Brewster, considering the bill for the relief of Fitz-John Porter, said:

''One of my predecessors, in an opinion dated January 9, 1873 (14 Opin., 164), in which the same subject is considered, after reviewing the action of both the executive and legislative branches of the Government in regard to the promotion and appointment of officers in the Army, concludes thus: 'It may therefore be regarded as definitely settled by the practice of the government that the regulation and government of the Army include, as being properly within their scope, the regulation of the appointment and promotion of officers therein. And as the Constitution expressly confers upon Congress authority to make rules for the government and regulation of the Army, it follows that that body may, by virtue of this authority, impose such restrictions and limitations upon the appointing power as it may deem proper in regard to making promotions or appointments to fill any and all vacancies of whatever kind occurring in the Army; provided, of course, that the restrictions and limitations be not inconsistent or incompatible with the exercise of the appointing power by the department of the Government to which that power constitutionally belongs.'

''Conceding, however, all that is here claimed for Congress under the provision of the Constitution adverted to, it does not follow that the right to regulate appointments to offices in the Army can be carried to the designation of particular individuals to fill such offices, without imposing an unconstitutional restriction upon the appointing power. The right of Congress to regulate is itself limited by the necessity of leaving due scope to the appointing power for the exercise of judgment and will in performing its functions, as contemplated by the Constitution.''

In *McAllister* v. *United States* (1890) 141 U. S. 174, the

Hon. William Howard Taft, then Solicitor General, subsequently President of the United States and now Chief Justice of the Supreme Court, represented the Government. In so far as disclosed by the published decisions, but a single question was raised by him or decided by the court. At page 177 we find the following:

"The government disputes the right of the appellant to receive any part of the sum for which he brings suit. Its defence rests upon par. 1768 of the Revised Statutes. That section and the one proceeding it are as follows:

" 'Sec. 1767.—Every person holding any civil office to which he has been or may hereafter be appointed by and with the advice and consent of the Senate, and who shall have become duly qualified to act therein, shall be entitled to hold such office during the term for which he was appointed, unless sooner removed by and with the advice and consent of the Senate, or by the appointment, with the like advice and consent, of a successor in his place, except as herein otherwise provided.

" 'Sec. 1768.—During any recess of the Senate the President is authorized, in his discretion, to suspend any civil officer appointed by and with the advice and consent of the Senate, except judges of the courts of the United States, until the end of the next session of the Senate, and to designate some suitable person, subject to be removed, in his discretion, by the designation of another, to perform the duties of such suspended officer in the meantime; and the person so designated shall take the oath and give the bond required by law to be taken and given by the suspended officer, and shall, during the time he performs the duties of such officer, be entitled to the salary and emoluments of the office, no part of which shall belong to the officer suspended. The President shall, within thirty days after the commencement of each session of the Senate, except for any office which in his opinion ought not be filled, nominate persons to fill all vacancies in office which existed at the meeting of the Senate, whether temporarily filled or not, and also in the place of all officers suspended; and if the Senate during such session shall refuse to advise and consent to an appointment in the place of any suspended officer, then, and not otherwise, the President shall nominate another person as soon as practicable to the same session of the Senate for the office.'

"These sections were brought forward from the act of March 2, 1867, regulating the tenure of certain civil offices, and the act of April 5, 1869, amendatory thereof. 14 Stat. 430, c. 154; 16 Stat. 6, c. 10. By an act of Congress approved March 3, 1887, those sections, as well as sections 1769, 1770, 1771 and 1772, relating to the same subject, were repealed, subject to the condition that the repeal should not affect any officer theretofore suspended, or any designation, nomination or appointment, previously made under or by virtue of the repealed sections. 24 Stat. 500 c. 353. As the appointment and suspension of Judge McAllister occurred prior to the passage of the act of 1887, the present case is not controlled by its provisions, but depends upon the effect to be given to the sections of the Revised Statutes above quoted, interpreted in the light of the act establishing the court of which the appellant was made judge in the year 1884. What may be the powers of the President over territorial judges, now that section 1768 is repealed, is a question we need not now discuss.

"By an act passed May 17, 1884, 23 Stat. 24, c. 53, the territory ceded to the United States by Russia, and known as Alaska, was constituted a civil and judicial district, with a governor, attorney, judge, marshal, clerk and commissioners, to be appointed by the President, by and with the advice and consent of the Senate, and to hold their respective offices for the term of four years, and until their successors were appointed and qualified."

Construing various provisions of the act last above mentioned in connection with sections 1767 and 1768, the court held, as stated in the syllabus, that—

"A person appointed by the President, by and with the advice and consent of the Senate, under the provisions of the act of May 17, 1884, 23 Stat. 24, c. 53, par. 3, to be the judge of the District Court of the District of Alaska, is not a judge of a court of the United States within the meaning of the exception in section 1768 of the Revised Statutes, relating to the tenure of office of civil officers, and was, prior to its repeal, subject to removal before the expiration of his term of office by the President, in the manner and upon the conditions set forth in that section."

The dissenting opinion by Mr. Justice Field, with whom concurred Mr. Justice Gray and Mr. Justice Brown, as summed

up in conclusion, was based upon the ground, first, that the judicial office in question was to be held by the incumbent during good behaviour, for the term prescribed, and, second, that section 1768, upon which the suspension was founded, expressly excepts the judges of the courts of the United States from suspension by the President and that exception includes all justices of all courts established under the laws of the United States, whether those courts perform a judicial duty within the state or within the territory.

The second of these two propositions in so far as it includes territorial judges within the exception referred to is in conflict with the majority opinion; but the first is incompatible with the view of the majority only in so far as it seeks to apply the general principle invoked to the particular "office in question," held by the majority not to be included within such exception.

We may put entirely out of view all that is said in the dissenting opinion with reference to distinctions that may or may not be drawn between territorial and constitutional courts of the United States, and all that is said about statutory construction, the intention of Congress and the applicability of section 1768,—in other words, all that is in conflict with the opinion of the majority. We may further eliminate the historical outline of the judicial office. We then have left a fundamental principle the soundness of which is not disputed, but, subject only to possible qualification, modification or infringement by Congress in the exercise of its sovereign legislative power, is tacitly if not expressly recognized by the majority.

This essential and uncontroverted proposition is contained in the following extract:

"My objection to the power exercised by the President in this case arises from the nature of the judicial office, when held by a judge of a court of record, . . . . The idea essentially appertaining to and involved in the judicial office is that its exercise must be free

from restraint, without apprehension of removal or suspension or other punishment for the honest and fearless discharge of its functions within the sphere of the jurisdiction assigned to it. No one in my judgment, under our system of law, can be appointed a judge of a court of record having jurisdiction of civil and criminal cases, to hold the office at the pleasure and will of another. No such doctrine has been maintained in England since the statute of 13 William III, chapter 2, 'for the further limitation of the Crown and better securing of the rights and liberties of the subject,' passed in 1700, one of the great acts which followed the revolution of 1688.

\*        \*        \*        \*        \*        \*        \*

"The great statutes referred to were passed long before our Revolution, and qualified the existing law of the English Kingdom and its dependencies as to the conditions upon which the judicial offices in courts of record could be held. The law thus modified then constituted a part of the public or common law of this country. Whoever is here clothed with a judicial office, which empowers him to judge in any case affecting the life, liberty or property of the citizen, cannot be restrained from the fearless exercise of its duties by any apprehension of removal or suspension, in case he should come athwart the will or pleasure of the appointing power. I cannot believe that under our Constitution and system of government any judicial officer invested with these great responsibilities can hold his office subject to such arbitrary conditions. In my judgment good behaviour during the term of his appointment is the only lawful and constitutional condition to the retention of his office.

\*        \*        \*        \*        \*        \*        \*

"Whenever this principle has been disregarded it has aroused deep and general indignation. Among the repeated injuries and usurpations of the King of Great Britain, which our fathers declared just ground for separation from the mother country, was that he had 'made judges dependent upon his will alone for the tenure of their offices and the amount and payment of their salaries.' This was one of the wrongs which our fathers submitted to 'a candid world' as justifying the people of the United States in withdrawing from the English nation and establishing for themselves a new form of government."

That there is no real conflict between these views and those of the majority is conclusively shown by the following excerpt

from the opinion of the court dealing with this phase of the case:

"An elaborate argument, displaying much thought and extended research upon the part of counsel, has been made in support of the proposition that, upon general principles, lying at the foundation of our institutions, the judicial power in the Territories, exercised as it must be for the protection of life, liberty and property, ought to have the guaranties that are provided elsewhere within the political jurisdiction of the nation for the independence and security of judicial tribunals created by Congress under the third article of the Constitution. We have no occasion to controvert the soundness of this view, so far as it rests on grounds of public policy. But we cannot ignore the fact that while the Constitution has, in respect to judges of courts in which may be vested the judicial power of the United States, secured their independence, by an express provision that they may hold their offices during good behaviour, and receive at stated times a compensation for their services that cannot be diminished during their continuance in office, no such guaranties are provided by that instrument in respect to judges of courts created by or under the authority of Congress for a Territory of the United States. The absence from the Constitution of such guaranties for territorial judges was no doubt due to the fact that the organization of governments for the Territories was but temporary, and would be superseded when the Territories became States of the Union. The whole subject of the organization of territorial courts, the tenure by which the judges of such courts shall hold their offices, the salary they receive and the manner in which they may be removed or suspended from office was left, by the Constitution, with Congress under its plenary power over the Territories of the United States. How far the exercise of that power is restrained by the essential principles upon which our system of government rests, and which are embodied in the Constitution, we need not stop to inquire; though we may repeat what was said in Mormon Church v. United States, 136 U. S. 1-44: 'Doubtless Congress, in legislating for the Territories, would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments; but these limitations would exists rather by inference, and the general spirit of the Constitution from which Congress derives all its powers, than by any express and direct application of its provisions.' It is only necessary in this case to say that those principles and limita-

tions are not violated by a statute prescribing for the office of judge of a territorial court a tenure for a fixed term of years, or authorizing his suspension, in the mode indicated in section 1768, and his ultimate displacement from office, after suspension, by the appointment of some one in his place, by and with the advice and consent of the Senate.

"It has been suggested that the conclusion reached in this case is not in harmony with some observations of Chief Justice Marshall in *Marbury* v. *Madison*, 1 Cranch, 137, 162. It was there said: 'Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is not removable at the will of the executive the appointment is not revocable, and cannot be annulled. It has conferred legal rights which cannot be resumed.' Again: 'Mr. Marbury, then, since his commission (as a Justice of the Peace in the District of Columbia) was appointed; and as the law creating the office gave the officer a right to hold for five years, independent of the executive, the appointment was not revocable, but vested in the officer legal rights, which are protected by the laws of his country.' Further: 'It (the office of Justice of the Peace in the District of Columbia) has been created by special act of Congress, and has been secured, so far as these laws can give security, to the person appointed to fill it, for five years. 2 Stat. 107, c. 15, par. 11.' Nothing in those observations militates, in any degree, against the view we have expressed. On the contrary, the Chief Justice asserted the authority of Congress to fix the term of a Justice of the Peace in the District of Columbia beyond the power of the President to lessen it by his removal, or by withholding his commission after his appointment has been made, pursuant to an act of Congress, by and with the advice and consent of the Senate, and after the commission has been signed by the President and sealed by the Secretary of State. So, in the present case, while Congress fixed the term of office of the District Judge for Alaska at four years, and until his successor qualified, it did so without modifying, and, therefore, in view of the statute then in force, giving the President power to *suspend*, in his discretion, any civil officer (other than judges of the courts of the United States) appointed by him, with the advice and consent of the Senate, until the end of the next session of that body. The decision in the present case is a recognition of the complete authority of Congress over territorial offices, in virtue

of 'those general powers which that body possesses over the Territories of the United States,' as *Marbury* v. *Madison* was a recognition of the power of Congress over the term of office of a Justice of the Peace for the District of Columbia.

"It was insisted, at the bar, that a territorial judge, appointed and commissioned for a given number of years, was entitled, of right, to hold his office during that term, subject only to the condition of good behaviour. This view was not rested upon any specific clause of the Constitution, but was supposed to be justified by the genius and spirit of our free institutions, and the principles of the common law. This argument fails to give due weight to the fact that, in legislating for the Territories, Congress exercises 'the combined powers of the general and of a state government.' Will it be contended that a State of the Union might not provide by its fundamental law, or by legislative enactment not forbidden by that law, for the suspension of one of its judges, by its governor, until the end of the next session of its legislature? Has Congress under 'the general right of sovereignty existing in the government of the United States as to all matters committed to its exclusive control, including the making of needful rules and regulations respecting the Territories of the United States, any less power over the judges of the Territories than a State, if unrestrained by its own organic Law, might exercise over judges of its own creation? If Congress may—*and it is conceded that it may*—prescribe a given number of years as the term of office of a territorial judge, we do not perceive why it cannot provide that his appointment shall be subject to the condition, that he may be suspended by the President, until the end of the next session of the Senate, and displaced altogether by the appointment of some one in his place, by and with the advice and consent of that body."

The answer to another contention made in the *McAllister Case* is found at page 185, where, after holding that "the words judges of the courts of the United States in section 1768 were used with reference to the recognized distinction between courts of the United States and mere territorial or legislative courts," the opinion continues thus:

"This view, it is contended, is not supported by the history of Congressional legislation relating to the organization of courts in the Territories. We do not assent to this proposition. The acts

providing for courts in the Territories of Orleans, Iowa, Minnesota, New Mexico, Utah, Colorado, Nevada, Dakota and Arizona, fixed the tenure of office for judges in those Territories, respectively, at four years. Those providing for courts in the Territories of Missouri, Arkansas, Florida, Oregon, Washington, Nebraska, Kansas, Idaho, Montana, Wyoming and Oklahoma fixed the tenure of judges at four years, with the addition, in some cases, of the words, 'unless sooner removed;' in others, of the words, 'unless sooner removed by the President,' or, 'and no longer,' or 'and until their successors shall be appointed and qualified,' or 'unless sooner removed by the President with the consent of the Senate.' Of course, Congress would not have assumed, in the acts providing for courts in the Territories named, to limit the terms of the judges, in the modes indicated, if it had supposed that such courts were courts of the United States of the class defined in the first section of article three of the Constitution, the judges of which hold, beyond the power of Congress to provide otherwise, during good behavior. Nor is the view that courts in the Territories are legislative courts, as distinguished from courts of the United States, weakened by the circumstances that Congress in a few of the acts providing for territorial courts, fixed the terms of the office of the judges of those courts during 'good behavior.' As the courts of the Territories were not courts the judges of which were entitled, by virtue of the Constitution, to hold their offices during good behavior, it was competent for Congress to prescribe the tenure of good behavior, as in the acts last referred to, or to prescribe, as in the other acts above referred to, the tenure of four years and no longer, or four years unless sooner removed, or four years unless sooner removed by the President with the consent of the Senate, or four years and until a successor was appointed and qualified. The significance of these enactments, as well as of the acts of 1867 and 1869, and of section 1768 of the Revised Statutes, is in the fact that Congress has uniformly proceeded upon the theory that the judges of territorial courts were merely legislative courts, and were not entitled, by virtue of their appointment and the Constitution of the United States, to hold their offices during good behavior, unless it was so declared in the respective acts providing for the organization of such courts. That Congress when providing a government for Alaska so regarded them is apparent from the fact that the act of May 17, 1884, fixed the tenure of the office of the judge of the District Court of Alaska at four years, and until his successor was appointed and qualified. This provision

did not repeal section 1768 of the Revised Statutes; for it was not inconsistent with that section. So that the Alaska act must be taken as qualified by that section which confers upon the President the power of suspension.''

In 1897 when the *Parsons Case* was decided, Justices Bradley, Blatcheford and Lamar had been succeeded by Justices Shiras, White and Peckham. Of the majority in the *McAllister Case* only Chief Justice Fuller, Mr. Justice Harland, who wrote the opinion, and Mr. Justice Brewer remained. Justices Field, Gray and Brown, who dissented in the *McAllister Case,* participated in the *Parsons Case* and apparently found no serious inconsistency between the later decision and the views expressed by them in the earlier dissenting opinion. What was decided in the *Parsons Case,* 167 U. S. 324, is summarized in the syllabus as follows:

''The President has power to remove a district attorney of the United States, when such removal occurs within four years from the date of the attorney's appointment, and, with the advice and consent of the Senate, to appoint a successor to him.

''Section 769 of the Revised Statutes which enacts that 'district attorneys shall be appointed for a term of four years and their commission shall cease and expire at the expiration of four years from their respective dates' provided that the term shall not last longer than four years, subject to the right of the President to sooner remove.

''It was the purpose of Congress, in the repeal of the tenure of office sections of the Revised Statutes, to again concede to the President the power of removal, if taken from him by the original tenure of office act, and by reason of the repeal, to thereby enable him to remove an officer when in his discretion he regards it for the public good, although the term of office may have been limited by the words of the statute creating the office.''

If Congress, instead of providing that ''District Attorneys' shall be appointed for a term of four years and their commissions shall cease and expire at the expiration of four years from their respective dates,'' had simply said that district

attorneys shall be appointed for a term of four years, or for a term of four years unless sooner removed for cause shown, or had specified a term of four years and thereafter until their successors in office should be appointed and qualified, or had otherwise manifested a clear and unmistakable intention to fix a definite term as distinguished from a mere limitation upon what otherwise might become a life tenure, then obviously a very different question would have been presented and decided.

After a review of congressional debates, followed by extracts from the *Hennen Case* and from the opinions of Attorneys General Clifford (1874), Crittenden (1851), Evarts (12 Opinions Attorney General, 4, 39, 446), Cushing (6 Opinions Attorney General, 4), and citation of the *Belger Case* (12 Opinions Attorney General, 421, 425), and of the opinion by Attorney General Devens (12 Opinions Attorney General, 421), the court said:

"The foregoing references to debates and opinions have not been made for the purpose of assisting us in ourselves arriving at a decision of the question of the constitutional power of the President in his discretion to remove officials during the term for which they were appointed and notwithstanding the existence of a statute prohibiting such removal, but simply for the purpose of seeing what the views of the various departments of the Government have been upon the subject of the power of the President to remove and what claims were made and how much of acquiescence had been given to the proposition that to the President belonged the exclusive power of removal in all cases other than by way of impeachment. It is unnecessary for us in this case to determine the important question of constitutional power above stated.

"The short review we have taken throws light upon the question of the true construction of the language used by Congress in the section of the Revised Statutes under examination. Other legislation will be adverted to."

Of *McAllister* v. *United States* it is said:

"There is nothing in that case which gives any countenance to the doctrine contended for by the appellant.

"The case contains nothing in opposition to the contention as to the practical construction that had been given to the Constitution by Congress in 1789 and by the Government generally since that time and up to the act of 1867."

The opinion then proceeds to show that the statute of 1789 simply provided for the appointment of district attorneys without provisions as to term or removal, and that in 1820 an Act was passed entitled "An Act to limit the term of office of certain officers therein named and for other purposes," providing in its first section that "all district attorneys * * * shall be appointed for the term four years but shall be removable from office at pleasure." Then comes the logical conclusion as to the meaning of Congress at that time:

"The provision in the second section, that the commissions should cease and expire at the end of four years, shows clearly that the intention of Congress was to restrict what had been a possible life term of office to a period of not more than four years under any one appointment. The provision for a removal from office at pleasure was not necessary for the exercise of that power by the President, because of the fact that he was then regarded as having been clothed with such power in any event. Considering the construction of the Constitution in this regard as given by the Congress of 1789, and having in mind the constant and uniform practice of the Government in harmony with such construction, we must construe this act as providing absolutely for the expiration of the term of office at the end of four years, and not as giving a term that shall last, at all events, for that time, and we think the provision that the officials were removable from office at pleasure was but a recognition of the construction thus almost universally adhered to and acquiesced in as to the power of the President to remove."

There was no change thereafter until the passage of the first Tenure of Office Act of March 2, 1867.

From the historical sketch and criticism of the legislation then initiated, we gather that the court did not fully approve of the conduct of Congress in this regard and perhaps even

entertained some doubt as to the constitutionality of the enactments in question, but they are not held to be unconstitutional.

The key to the whole opinion as well as the entire substance thereof is contained in the last three or four paragraphs which we need not quote in full here. If will suffice to say that at page 343 we find all the historical data accumulated in the preceding pages brought to a focus upon section 769 of the Revised Statutes, *supra,* in support of the conclusion that "the same construction of the language of that section should be adopted which we would apply to the Act of 1820, and which was applied by Attorney General Crittenden and acted upon by the President in the case of the chief justiceship of the Territory of Minnesota, V Opinions of Attorneys General, 288, a construction of limitation and not of grant, a construction by which no more than a period of four years is permissible, subject in the meantime to the power of the President to remove."

The court does not say that the construction "applied by Attorney General Crittenden and acted upon by the President in the case of the chief justiceship of the Territory of Minnesota" was the proper construction in that case or that it would have reached the same conclusion in the circumstances there involved. Nor, *a fortiori,* does it intimate that if Congress had provided for a term of four years unless sooner removed by the President for cause, or after notice of charges preferred and a hearing, whether in *haec verba* or by necessary implication from the fixing of a definite term in clear and unmistakable language, then such enactment would be unconstitutional. It is content to add that—

"In thus construing section 769 we think full effect is given to its language and the practical construction of former periods is adhered to, while at the same time the purpose of Congress to retain officials in office is also given full effect by the succeeding provisions upon the subject of the tenure of office. The right to remain in

office is made to depend upon those subsequent sections, and ,when in 1887 they were repealed by Congress, 24 Stat. 500, the full legal force and effect of the language used in section 769 was permitted to come into play, freed from the restraints of the section thus repealed. Such being the case, the persons appointed under section 769 are not entitled to hold for four years as against any power of the President to remove, and in no event can they remain in office longer than that period without being reappointed. This construction of the act as one of limitation, we think, in the light of the history of the subject, is a most natural and proper one."

Moreover, the succeeding paragraphs plainly indicate that even the conclusion last above mentioned is reached and relied upon *arguendo* rather than as the real basis of the decision, the gist of which is stated in the third paragraph of the syllabus, *supra,* and the proposition there stated seems to rest mainly upon the "extraordinary result" that would follow an adoption of the theory of appellant and the absurdity of imputing to Congress any intention to bring about such result.

"This could never have been the intention of Congress. On the contrary, we are satisfied that its intention in the repeal of the tenure of office section of the Revised Statutes was again to concede to the President the power of removal if taken from him by the original tenure of office act, and by reason of the repeal to thereby enable him to remove an officer when in his discretion he regards it for the public good, although the term of office may have been limited by the words of the statute creating the office. This purpose is accomplished by the construction we give to section 769, while the other construction turns a statute meant to enlarge the power of the President into one circumscribing and limiting it more than it was under the law which was repealed for the very purpose of enlarging it." *Idem,* p. 343.

In *Keim* v. *United States,* 177 U. S. 292, the court cites the cases of *Hennen* and *Parsons,* without adding anything to the doctrine of either, after quoting as follows:

"It cannot for a moment be admitted that it was the intention of the Constitution that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by

whom is such removal to be made? In the absence of all constitutional provision or statutory regulation it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment.''

In 1901 Mr. Chief Justice Fuller delivered the opinion of the court in *Reagan* v. *United States,* 182 U. S. 419. At that date Mr. Justice Field had been succeeded by Mr. Justice McKenna. With this exception the personnel of the court was the same as in the *Parsons Case.*

An act of Congress had provided ''that the United States court in the Indian Territory shall have all the powers of the United States Circuit Courts or Circuit Court Judges to appoint commissioners within said Indian Territory * * * and such commissioners, when appointed, shall have within the district to be designated in the order appointing them, all the powers of commissioners of circuit courts of the United States * * * and said commissioners shall exercise all the powers conferred by the laws of Arkansas upon justices of the peace within their districts, but they shall have no jurisdiction to try any cases where the value of the thing or the amount in controversy exceeds $100.''

A later act provided for additional judges with power to appoint commissioners with certain prescribed qualifications and: *''Provided* that the present commissioners shall be included in that number and shall hold office under their existing appointments, subject to removal by the judge of the district where said commissioners reside for causes prescribed by law.''

We quote from the opinion (italics ours):

''Appellant was appointed a commissioner April 25, 1893, and was such on March 1, 1895. In view of the proviso he was continued in office until January 31, 1896, when he was removed by the judge of the district where he resided, and another person appointed.

''He now contends that the removal was void, because the cause assigned for the action of the judge was not a 'cause prescribed by

law,' and because he was given no notice of any charge against him, and no hearing, contrary to the statute.

"The commissioners appointed by the judges of the United States Court in the Indian Territory are inferior officers, not holding their offices for life, *or by any fixed tenure,* and they *fall within the settled rule* that the power of removal is incident to the power of appointment. Ex parte Hennen, 13 Pet. 230, 258; Parsons v. United States, 167 U. S. 324. But it is assumed that because of the language of the proviso, commissioners appointed by the court prior to March 1, 1895, formed an exceptional class from commissioners appointed by the judges of that court after that date, and hold office until they are removed for causes prescribed by existing law, or until Congress passes a law defining such causes. The latter view may be rejected at once, for the words 'causes prescribed by law' manifestly relate to causes prescribed when the act was approved, or at least when the removal was made. Not only is there nothing here to give them any other meaning, but it cannot be presumed that Congress intended to forbid the exercise by the judges of their power in the matter of these appointments in the instance of these particular commissioners, or to provide that they should hold office during life, or until Congress should specify causes subjecting them to removal, while all other commissioners were removable at the will of the power appointing them.

    *    *    *    *    *    *    *

"The inquiry is therefore whether there were any causes of removal prescribed by law, March 1, 1895, or at the time of the removal. *If there were, then the rule would apply that where causes of removal are specified by constitution or statute, as also where the term of office is for a fixed period, notice and hearing are essential.* If there were not, the appointing power could remove at pleasure or for such cause as it deemed sufficient.

    *    *    *    *    *    *    *

"It does not appear that any causes for removal of these court officers were ever affirmatively specified by Congress, but it is said that Congress had prescribed such causes by the adoption in the Indian Territory of certain laws of Arkansas. By section thirty-one of the act of May 2, 1890, some of those laws were put in force in the Indian Territory, and by section thirty-nine the commissioners were authorized to exercise all the powers conferred by the laws of Arkansas on justices of the peace within their districts, and the provisions of chapter ninety-one of those laws regulating the jurisdic-

tion of and procedure before justices of the peace were extended to that Territory. By the act of March 1, 1896, these were reenacted, and chapters forty-five and forty-six of Mansfield's Digest, treating of criminal law and criminal procedure, were also put in force there.

"The argument is that the effect of these provisions was to put the commissioners in the place of justices of the peace in Arkansas, and that consequently the causes prescribed by law for the removal of justices of the peace must be taken as prescribed by law as causes for the removal of commissioners.

"In our opinion this conclusion does not follow. In order to clothe the commissioners with the powers pertaining to justices of the peace, this was conveniently accomplished by reference, but that did not convert these officers of the United States Court in the Indian Territory into justices of the peace or change the relation between them and the judges of that court. Justices of the peace in Arkansas by state constitution and laws hold office for two years, and cannot be removed except for cause, and on notice and hearing. *The commissioners hold office neither for life, nor for any specified time, and are within the rule which treats the power of removal as incident to the power of appointment, unless otherwise provided.* By chapters forty-five and forty-six, justices of the peace on conviction of the offences enumerated are removable from office, but these necessarily do not include all causes which might render the removal of commissioners necessary or advisable. Congress did not provide for the removal of commissioners for the causes for which justices of the peace might be removed, and if this were to be ruled otherwise by construction, *the effect would be to hold the commissioners in office for life unless some of those especially enumerated causes become applicable to them."* '182 U. S. 424–25–26.

Two years later, Mr. Justice Holmes and Mr. Justice Daly having succeeded Mr. Justice Gray and Mr. Justice Shiras, the court in *Shurtleff* v. *United States*, 189 U. S. 313, again speaking through Mr. Justice Peckham, who wrote the opinion in the *Parsons Case*, said (italics ours) :

"The office of general appraiser of merchandise was created by the twelfth section of the act of Congress approved June 10, 1890, commonly called the Customs Administrative Act. 26 Stat. 131, 136, The material portion of that section reads as follows:

" 'Sec. 12. That there shall be appointed by the President, by

and with the advice and consent of the Senate, nine general appraisers of merchandise, each of whom shall receive a salary of seven thousand dollars a year. Not more than five of such general appraisers shall be appointed from the same political party. They shall not be engaged in any other business, avocation or employment, and may be removed from office at any time by the President for inefficiency, neglect of duty, or malfeasance in office * * *.

"There is, of course, no doubt of the power of Congress to create such an office as is provided for in the above section. *Under the provision that the officer might be removed from office at any time for inefficiency, neglect of duty, or malfeasance in office, we are of opinion that if the removal is sought to be made for those causes, or either of them, the officer is entitled to notice and a hearing. Reagan v. United States*, 182 U. S. 419, 425. In speaking of causes of removal, Mr. Chief Justice Fuller said in that case:

" 'The inquiry is therefore whether there were any causes of removal prescribed by law, March 1, 1895, or at the time of the removal. *If there were, then the rule would apply that where causes of removal are specified by Constitution or statute, as also where the term of office is for a fixed period, notice and a hearing are essential.* If there were not, the appointing power could remove at pleasure or for such causes as it deemed sufficient.'

"Various state courts have also held that where an officer may be removed for certain causes, he is entitled to notice and a hearing. See Dullam v. Willson, 53 Michigan, 392, 401; Pa. e. g. Hardin, 8 B. Mon. 648, 672; Willard's App. 4 R. I. 597; Commonwealth v. Slifer, 25 Pa. St. 23, 28; State v. Hawkins, 44 Ohio St. 98, 114; Biggs v. McBride, 17 Oregon, 640, 650; Ham v. Boston, 143 Massachusetts, 90.

"It must be presumed that the President did not make the removal for any cause assigned in the statute, *because there was given to the officer no notice or opportunity to defend.* The question then arises, can the President exercise the power of removal for any other causes than those mentioned in the statute; in other words, is he restricted to a removal for those causes alone or can he exercise his general power of removal without such restriction?

"*We assume,* for the purposes of this case only, *that Congress could attach such conditions to the removal of an officer appointed under this statute as to it might seem proper, and, therefore, that it could provide that the officer should only be removed for the causes*

*stated and for no other, and after notice and an opportunity for a hearing.* Has Congress by the twelfth section of the above act so provided?

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"The appellant contends that because the statute specified certain causes for which the officer might be removed, it therefore impliedly excluded and denied the right to remove for any other cause, and that the President was therefore by the statute prohibited from any removal excepting for the causes, or some of them therein defined. The maxim, *expressio unius est exclusio alterius,* is used as an illustration of the principle upon which the contention is founded. We are of opinion that as thus used the maxim does not justify the contention of the appellant. We regard it as inapplicable to the facts herein. The right of removal would exist if the statute had not contained a word upon the subject. *It does not exist by virtue of the grant, but it inheres in the right to appoint, unless limited by* Constitution *or statute.* It requires plain language to *take it away.* Did Congress by the use of language providing for removal for certain causes thereby provide that the right could only be exercised in the specified causes? *If so, see what a difference in the tenure of office is effected as to this office, from that existing generally in this country.* The tenure of the judicial officers of the United States is provided for by the Constitution, but with that exception no civil officer has ever held office *by a life tenure* since the foundation of the government. Even judges of the territorial courts may be removed by the President. McAllister v. United States, 141 U. S. 174. *To construe the statute as contended for by appellant is to give an appraiser of merchandise the right to hold that office during his life or until he shall be found guilty of some act specified in the statute.* If this be true, *a complete revolution in the general tenure of office is effected,* by implication, with regard to this particular office. We think it quite inadmissible to *attribute an intention on the part of Congress to make such an extraordinary change in the usual rule governing the tenure of office, and one which is to be applied to this particular office only,* without stating such intention in plain and explicit language, instead of leaving it to be implied from doubtful inferences. The rule which is expressed in the maxim is a very proper one and founded upon justifiable reasoning in many instances, but should not be accorded controlling weight when to do so would *involve the alteration of the universal practice of the government for over a century and the consequent curtailment of the powers.* We can see

no reason for such action by Congress with reference to this office or the duties connected with it."

This case, assuming, without deciding, that Congress "could provide that the officers should only be removed for the causes stated and for no other," and following the rule of construction adopted in the previous cases of *Blake, Mc-Allister* and *Parsons*, holds that the intention to do so must be clear and unmistakable. Here the court is not discussing the effect of a fixed term, nor the power of Congress to fix a term, both of which propositions are conceded, but is considering whether or not Congress in specifying certain causes of removal could have intended to *take away* from the President the power to remove for any causes not so specified. But the opinion *also expressly ratifies and reaffirms* the doctrine of *Ex parte Hennen* and *Reagan* v. *United States* to the effect that *"where causes of removal are specified* by Constitution *or statute,* as also *where the term of office is for a fixed period, notice and hearing are essential."* There being no such causes specified or tenure fixed by the Constitution, in so far as inferior offices are concerned, this is tantamount to the shorter form adopted by Mr. Justice Brandeis in *Burnap* v. *United States, supra,* where the stereotyped reference to the Constitution is omitted and the words "statutory provision to the contrary" are employed as covering the whole ground. The quotation from the *Reagan Case* taken in connection with the preceding statement constitutes an avowal of the power of Congress, by fixing a term without more and through the legal effect attributed to such action, to regulate the exercise of the implied power of removal. The reasoning also goes back to *Ex parte Hennen* in its justification of a resort to the doctrine of an implied power of removal as the only alternative to a life tenure. For the purposes of the case at bar, we need not speculate as to whether it may be more accurate to say that such power is never absolute in the sense that the manner of its exercise

cannot be regulated or in any wise restricted by Congress, or to affirm that in the event of statutory provisions fixing a term or specifying a removal for cause, then, the reason and necessity for the rule not being apparent, an absolute prerogative cannot be inferred from the power of appointment nor regarded as inherent therein, or, in other words, that in such case the occasion for such an inference never arises because the logical basis therefor does not exist. In neither case does it follow, nor has the Supreme Court of the United States ever held, that the requirements of notice and a hearing implied from the fixing of a term by statutory provision must yield to the implied power of removal as a corollary to the constitutional power of appointment. On the contrary the *Shurtleff Case,* perhaps more than any other, seems to point plainly to the opposite of the conclusion now sought to be drawn therefrom.

From the opinion of the Supreme Court of New Mexico in *Territory* v. *Armijo,* 89 Pac. 267, we take the following:

"The defendants's contention rests on three propositions, which, stated in logical sequence, are: That the President of the United States has the power of removal from office. That he has that power by virtue of sections 1 and 3 of article 2 of the Constitution of the United States. That the grant of executive power to the Governor in section 3 of the organic act (section 1841, Rev. St. U. S.) is practically identical in language and meaning with the related portions of the above-named sections of the Constitution. From these main premises, as they are explained and supported by other portions of the Constitution and the organic act, it follows, he claims, as a necessary conclusion, that the power of the Governor in his sphere of duty is the same as the President's in his. The portions of section 3 of the organic act on which the defendant especially relies are as follows: 'That the executive power and authority in and over said territory of New Mexico shall be vested in a Governor; * * * he shall commission all officers who shall be appointed to office under the laws of the said territory, and shall take care that the laws be faithfully executed.' This is practically a paraphrase of the corresponding provisions of the Constitution from which it was pre-

sumably adopted. We feel bound to follow the question whither it leads, although that be into the domain of constitutional law, which is the peculiar province of the Supreme Court of the United States. The claim that the President has the power of removal so accords with the common understanding and observation, that it would not seem to require examination, but, singularly enough, we are well on in the second century of the Constitution, and of the Supreme Court without a decision by that august tribunal that the President has or has not the power to remove from office, as a constitutional right. It is a striking fact that a power so transcendent as that is should depend upon inference merely, and has never received judicial discussion. 1 Kent's Com. (12th Ed.) p. 310. 'Since the time of that statement there has been a thorough historical discussion of the subject in Parsons v. United States, 167 U. S. 324, 17 Sup. Ct. 880, 42 L. Ed. 185 (1896), cited by the defendant, but the examination concludes thus: 'The foregoing references to debates and opinions have not been made for the purpose of assisting us in ourselves arriving at a decision of the question of the constitutional power of the President in his discretion to remove officials during the terms for which they were appointed, and notwithstanding the existence of a statute prohibiting such removal, but simply for the purpose of seeing what the views of the various departments of the government have been upon the subject of the power of the President to remove, and what claims were made, and how much of acquiescence had been given to the proposition, that to the President belonged the exclusive power of removal in all cases other than by way of impeachment. It is unnecessary for us in this case to determine the important question of constitutional power above stated.' In United States v. Guthrie, 17 How. (U. S.) 284, 15 L. Ed. 102, examined in the same opinion, the majority of the court held that the question of constitutional power was not involved but Justice McLean delivered a dissenting opinion, in which he maintained that the question of the power of the President to remove was before the court, and that it was not by the Constitution committed solely to the President. We think it necessary therefore, since the defendant relies so largely on the alleged correspondence of the Governor's power of removal to that of the President, to make some search for the foundation on which the latter rests and then inquire whether that of the Governor has the same or a like basis.

\*          \*          \*          \*          \*          \*          \*

"The defendant further contends that Congress having plenary

power over the territories, must, in the exercise of it, be supposed to have preserved, through the executive, a 'vein of power ascending to the general government' so protected that it would not be open to attack and destruction by the people for whose restraint it was made. Especially it is urged, would Congress naturally take such a course in the case of territory then but lately acquired through war, and with a population hostile to our government.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

"In the organic act there is little trace of any disposition to repress or dominate the people of the territory. 'The vein of power ascending' to the government of the United States—several such veins, indeed—were preserved. The governor and the judges of the higher courts were to be appointed by the President. The Governor was made an essential part of the legislative department (Organic Act, section 5), and finally, Congress reserved to itself the right, which, as the court said in National Bank v. County of Yankton, 101 U. S. 132, 133, 25 L. Ed. 1046, it had without reserving it, to annul all legislative acts which should not meet with its approval. Organic Act, Sec. 7. But those were not unusual provisions in establishing civil government for territories . . . . . That part of the original territory of the New Mexico which still retains the name and territorial organization originally adopted by Congress has been for more than half a century under a territorial government. In that time there has grown up a body of statute laws dealing with all the principal matters which are the subjects of legislation in the different states of the Union. In only two instances in all that time has Congress seen fit to annul a statute enacted by the territorial assembly. That circumstance is cited, not to show that only two laws deserving of annulment have been made by the assembly— probably there have been many such—but the more there have been the stronger is the proof of the forbearing course of the general government toward the people of this territory. If the same power had existed over the legislation of the states, how many would have fared better in that respect?

"The defendant attaches much importance to the fact that the people of the territories are wholly dependent on the government of the United States for their political rights, which, as the court declares, in Murphy v. Ramsey, 114 U. S. 44, 45, 5 Sup. Ct. 747, 764, 29 L. Ed. 47, are 'franchises which they hold as privileges in the legislative discretion of the Congress of the United States.' That the circumstance is highly significant in connection with this ex-

amination, we agree; but we think inferences are to be drawn from it quite different from those suggested by the defendant. This great power is held chiefly by Congress. In McAllister v. United States, 141 U. S. 174, 11 Sup. Ct. 949, 35 L. Ed. 693, the court said: 'The decision in the present case is a recognition of the complete authority of Congress over territorial officers in virtue of those general powers which that body possesses over the territories of the United States, as Marbury v. Madison was a recognition of the power of Congress over the term of office of a justice of the peace for the District of Columbia.' Congress, naturally, would not act in derogation of its own rights, especially when the effect would be to strengthen another branch of the government. It could not have intended to create a territorial executive, to be appointed by the President, with power to nullify at will the elections by the people which it had authorized. Congress might no doubt have given the Governor all the power which is claimed for him. It might also have governed the territory by direct legislation, or through a commission, with no individual executive and without participation in the government by the people. But that Congress need not have given to the people of New Mexico a shred of self-government is not at all inconsistent with the evident fact that it did give them a very large measure of self-government. 'The organic law of a territory takes the place of a Constitution as the fundamental law of the local government.' National Bank v. Yankton, supra. The political rights conferred by it are, in law, as secure and sacred as those guarantied by the Constitution of the United States, until they are, through legislation, withdrawn by the power which bestowed them.

"Finally, it must be believed that Congress has had knowledge, actual as well as constructive, of what has transpired in New Mexico in relation to the matter of the Governor's power to remove from office. The organic act (section 7) provides that 'all the laws passed by the legislative assembly and governor shall be submitted to the Congress of the United States, and, if disapproved, shall be null and void.' There has been such a law giving the Governor the right to remove sheriffs from office, another taking away the right so given, and there is now such a law providing for the removal of sheriffs by the district courts in certain cases. All these laws have, presumably, been submitted to Congress. Besides that, the question of the Governor's power to remove has been at least three times before this court, it has never been held to exist, as now asserted, and has once been denied. Territory v. Ashenfelter, supra (1887); Conklin

v. Cunningham, 7 N. M. 445, 38 Pac. 170 (1894); Eldolt v. Territory, 10 N. M. 141, 61 Pac. 105 (1900). The first named case went also to the Supreme Court of the United States, where it remained more than six years, was twice argued, twice ordered to be reargued—once with notice to the Attorney General—and was finally dismissed without a decision.

     ❊      ❊      ❊      ❊      ❊      ❊      ❊

"Instead of increasing the power of the Governor, Congress in 1868 (section 1842, Rev. St. U. S.) seriously diminished it by depriving him of the share in the making of legislation and of the right of absolute veto of acts of the assembly which theretofore he had, and left him only the veto power as ordinarily limited. And it is, indeed, of a piece with the general policy of Congress not to interfere except in extreme cases with the conduct of the affairs of a territory by its people. It has considered and treated the territorial form of government as a kind of training school for statehood—the territory as the embryo of the future state—a state like its sister states in all essential particulars."

Again, in *Territory* v. *Mann* (1911), 114 Pac. 362, the same court says:

"It is contended by respondent's counsel, however, in his very thorough brief and argument that the Ashenfelter case is contrary to both authority and reason. It is said that it has been doubted in a subsequent case decided in this court (Territory v. Armijo, 14 N. M. 202, 89 Pac. 275) and that the premises upon which it proceeds have been shown to be clearly untenable in a number of federal cases decided since the decision.

"The cases principally relied upon to the latter effect are Mc-Allister v. United States, 141 U. S. 174, 11 Sup. Ct. 949, 35 L. Ed. 693, Parsons v. United States, 167 U. S. 324, 17 Sup. Ct. 830, 42 L. Ed. 185, and Shurtleff v. United States, 189 U. S. 311, 23 Sup. Ct. 535, 47 L. Ed. 828. It is urged that the cases just cited establish, first, that the President has an inherent power flowing from the functions of his office as defined in the Constitution to remove all officers appointed by him with the consent of the Senate except such as under the Constitution enjoy a life tenure; second, that the Governor under the organic act has precisely the same powers as to officers appointed by him by and with the advice and consent of the legislative council; and, third, that, therefore, the governor has the power of removal

as to such officers within the territory just as the President has within the nation at large. This contention has received the careful considerations its importance merits. An examination of the cases cited, however, does not carry us to the result for which respondent contends. In the Armijo Case we find nothing from this court doubting the correctness of the Ashenfelter Case upon the point here involved. That was a case involving the power of the Governor to remove a county officer elected by the people, and in it this court carefully reserves the question of whether the Ashenfelter Case has been disturbed by later federal authority. Turning to the latter class of decisions, the McAllister Case involved simply the question of whether a territorial judge in Alaska was 'a judge of a court of the United States' so as to be exempt from the power of suspension expressly conferred upon the President as to all civil officer (except such judges) by the tenure of office act. The Supreme Court held that a territorial judge was not within the exception of the statute, and was thus by express act of Congress subject to suspension by the President. This case shows that the executive power of removal was deemed attributable to statute rather than to the Constitution. In the Parsons Case the court was dealing with the removal by the President of a district attorney appointed under a statute similar in terms to that under which the present relator was named. The court reviewed the history of the exercise by the President of the power of removal and the legislation affecting it, including the act of May 15, 1820, c. 102, 3 Stat. 582, which expressly made district attorneys removable at pleasure, the implied repeal of this latter act by the first tenure of office act, March 2, 1897, c. 154, 14 Stat. 430, and the repeal of the latter act in 1887. The court held, 'in the light of the history of the subject,' that the term of office of four years provided for district attorneys was a limitation, and not a fixing of tenure. But the court in that case expressly declined to decide 'the question of the constitutional power of the President in his discretion to remove officials during the term for which they were appointed.' This is very clearly pointed out by this court, speaking through Associate Justice Abbott in Territory v. Armijo, supra, where the scope of the Parsons Case is discussed to an extent such as to render further comment upon it here unnecessary. We content ourselves with saying that a decision based as was that upon a course of national history and legislation surrounding and peculiar to the exercise of presidential functions furnishes no proper basis upon which to deduce the powers of a Governor of a territory.

"In the case of Shurtleff v. United States, supra, it is true that there are expressions to the effect that the President can by virtue of his general power of appointment remove an officer, even though appointed by and with the advise and consent of the Senate. But the court was there dealing with the case of the appointment of a general appraiser, in which there was no length of tenure designated at all. It was confronted by the alternative that, if the President had no power of removal, the incumbent (subject only to good behavior) held for life. A life tenure for such an officer, placing him upon the same basis as the judicial officers provided for in the Constitution, was held by the court to be manifestly not intended by Congress, and it held that his tenure, in the absence of any provision fixing it, was thus necessarily at the pleasure of the President. To a case such as the present, where the tenure is definite, Shurtleff's Case can furnish no analogy enabling us to define the powers of the Governor."

The editor of a note appended to *State* v. *Rhame,* Ann. Cases 1914 B, 519, concurs in the view taken of the *Parsons Case* by the Supreme Court of South Carolina: "For the reasons set forth in the comments thereon in the reported case, the case of Parsons v. United States * * * lends no support to the contention that the appointing power, in the absence of statutory provision therefor, has the right to remove an officer whose term is fixed."

In the note last above mentioned the cases discussing the right of the appointing power to remove an officer, when the term of office is fixed, are grouped in two classes, to wit: Those specifically denying the existence of such right as an incident to the appointing power, and those holding that "although the appointing power may have the right to remove an officer who holds for a fixed term, yet this right can be exercised only for cause shown."

Assuming the requirement as to "cause shown" to be the equivalent of that as to notice and a hearing, the significance of the cases decided by the Supreme Court is that, while the authority of *Marbury* v. *Madison* may or may not have been impaired to some extent by subsequent decisions, notably

the *Parsons Case,* and whether or not these later decisions go the full length of the rule announced by the first group of state cases, *supra,* yet the proposition stated in the second group has never been denied and has been in substance on various occasions, if not uniformly, recognized, announced and affirmed.

We need not repeat here all that has been said upon the subject in the state courts. The *Rhame Case* calls attention to the fact, already noted, that in *People* v. *Robb, supra,* the New York court of appeals says that the following provision of the Constitution of New York was an embodiment of the generally recognized rule: "When the duration of any office is not provided by the Constitution, it may be declared by law, and, if not so declared, such office shall he held during the pleasure of the authority making the appointment,"

See also *Roth* v. *State,* 63 N. E. 460, so construing an identical constitutional provision and citing the *Robb Case.*

In the *Opinion of the Justices to the Governor and Council,* 216 Mass. 605, we find the following:

"The substance of the question is whether under the Constitution the Governor as Commander-in-Chief, or the Governor and Council acting as the Executive Department of the government, have the unqualified power to remove the Adjutant General from office, or whether the General Court have the power to fix the term of his office and the manner of his removal.

"The power to appoint the Adjutant General is conferred by the Constitution, c. 1, par. 1, art. 10, in these words: 'The Governor shall appoint the Adjutant General.' If these words stood alone, the power to remove might be inferred from the power to appoint. See In re Hennen, 13 Pet. 230, 259. Power to remove a public officer is not a necessary and inherent incident of the authority to appoint. Frequently they are disjoined.

"But the Constitution contains another pertinent provision. In c. 2, par. 1, art. 4, are these words: 'And further, full power and authority are hereby given and granted to the said General Court, from time to time . . . . . to set forth the several duties, powers, and limits, of the several civil and military officers of this Common-

wealth.' Manifestly the Adjutant General is one of the 'military officers' of the Commonwealth. The word 'limits' as applied to military officers in this clause in connection with the other jurisdictional words used, includes the right to fix the tenure of office and manner of removal. It means boundaries as to time as well as to duty in service and power in command. The Legislature thus is clothed with authority to establish by general law the terms of office for all in the military arm of the service of the Commonwealth.

"Where the Constitution creates an office but makes no provision for the period of its term or the method of removal from it, the power of the Legislature to act in the public interests in these respects is well settled. Opinion of the Justices, 117 Mass. 603. Wales v. Belcher, 3 Pick. 508.

"The Legislature had the power touching such an office to lengthen or shorten its tenure during the incumbency of an appointee, and thereby extend or abbreviate the term from what it was when he first was appointed. Taft v. Adams, 3 Gray, 126. Barnes v. Mayor of Chicopee, 213 Mass. 1.

"These two provisions of the Constitution are harmonious. The absolute power of appointing the Adjutant General is vested in the Governor. But the Legislature may fix his term of office and determine the method of his removal. Each of these functions is independent of the other. Both may coexist in the same instrument without conflict between the executive and legislative departments.

"There is nothing inconsistent with the conclusion in Article IV of the Amendments to the Constitution to the effect that 'All officers commissioned to command in the militia may be removed from office in such manner as the Legislature may, by law, prescribe.' Indeed that amendment is confirmatory of the conclusion here reached.

"The Legislature has acted by fixing the term of office of the Adjutant General at five years and providing for his removal. Sts. 1912, c. 720, par. 1; 1908, c. 604 pars. 91, 92, 101. R. L. C. 18, par. 2, which empowers the Governor to remove any officer appointed by him unless otherwise provided by law applies only to those in the civil service.

"The power of Congress to legislate respecting removal of officers from the army and to limit the unrestrained powers of the President in that regard seems to be recognized in Blake v. United States, 103 U. S. 227, United States v. Carson, 114 U. S. 619, and Hartigan v. United States, 190 U. S. 169. See however Parsons v. United States, 167 U. S. 324. But whatever may be the respective powers of the

President and Congress under the Federal Constitution and the practice which has grown up under it, the broad terms of the grant of legislative powers to our General Court leaves no doubt as to its authority to enact St. 1912, c. 720."

There is no necessary conflict between this view of the matter and the doctrine of the United States Supreme Court as summed up in the simple statement by Mr. Justice Brandeis that "the power to remove is, in the absence of statutory provision to the contrary, an incident of the power to appoint."

The brief for respondent assumes, but does not show, that the Governor, in making appointments authorized by section 49 of the Organic Act, exercises the powers conferred upon the President by the Constitution of the United States. More or less of the same premise seems to persist in the proposition that in conferring the power of appointment upon the President and upon the Governor Congress uses the same language and must be understood to mean the same thing in both instances,—thus insinuating that the purpose was to confer upon the Governor the traditional power of the President under the Federal Constitution. Perhaps it would have sufficed to say that if the officers mentioned in section 49 are inferior officers of the United States within the meaning of article 2, section 2 of the Constitution, then Congress might vest the appointing powers in any one of the heads of departments of the National Government or in some judicial tribunal, but not elsewhere.

We have given so much time and space to the opinions of the Attorney General and of the Supreme Court of the United States, only because great stress has been laid upon them both in the brief for respondent and in argument among ourselves. The most that can be claimed for the doctrine announced therein as applicable to the case at bar is that; by analogy and *mutatis mutandis,* the same principle should govern in so far as the facts and circumstances involved may

bring this case within the reason of the rule. And, aside from the distinctions indicated in the New Mexico cases and elsewhere, thus far no effort whatever has been made to show that in dealing with the territories Congress has built up about the territorial executive any such breastwork of custom, practice, precedent and tradition as constitutes the historical basis for the now settled construction of the constitu·tional power of the President to remove officers of the United States, in the absence of statutory provisions to the contrary,—including the conclusion, if it be a necessary conclusion, that the intention of Congress to fix a term, whenever it undertakes to do so, must be clear. Certainly, the brief history of congressional legislation for this Island discloses no such policy in regard to the powers conferred upon the Governor in connection with appointments and removals. In the circumstances there would seem to be no sound reason why we should not adopt toward "the settled usage and practical construction" of the national Government under the Federal Constitution much the same attitude as was assumed by the Supreme Court in the *Hennen Case* and by the English courts therein referred to toward "the tenure of ancient common law offices" and the "ancient usage" upon which the rules and principles governing such tenure were based. But even otherwise, and conceding for the sake of argument that the implied power of removal in the Governor is as sacrosanct as that vested by implication in the President, and that the local Legislature has no more power to regulate the gubernatorial privilege than Congress has to interfere with the presidential prerogative,—yet the only tangible result under the decisions of the Supreme Court is that when a term is fixed, the intention to fix a term must be clear in order to prevail.

We do not deem it necessary to show by detailed analysis that our present Organic Act was intended to be, and is, a long stride toward complete self-government, or that a very

large measure of executive control over local legislative action was thereby relinquished. The Executive Council formerly constituting the upper house of the Legislative Assembly was composed entirely of presidential appointees. A majority of these were executive officers, and *ex officio* members of the Council. Four of the six heads of departments, substituted for the six executive officers formerly appointed by the President, by and with the advice and consent of the Senate of the United States, are now appointed by the Governor, by and with the advice and consent of the newly created elective insular Senate. Neither the manner in which this experiment is working in actual practice, nor the wisdom or unwisdom of congressional action in substituting an elective Senate for the old Executive Council can have any legitimate bearing upon the question now under consideration. The point is that in a general way the local legislative power was tremendously increased at the expense of former executive functions. The general trend, purpose and policy of this new grant of political power are self-evident and leave no room for reasonable doubt or debate.

With rare exceptions Congress, in dealing with presidential appointments in Porto Rico, as well as in transferring to the Governor the power previously exercised by the President in the naming of certain insular heads of departments, leaves little or nothing either to inference or to the imagination.

Section 17 of the Foraker Act constituted a separate general division thereof entitled "The Governor," who was "to hold his office for a term of four years and until his successor is chosen and qualified, unless sooner removed by the president." Under the Jones Act, section 12, the same being the first paragraph of a general division entitled "Executive Department," wherein adequate provision is made for the six executive departments thereby created, "the supreme executive power" is "vested in an executive of-

ficer whose official title shall be 'The Governor of Porto
Rico,' who is to hold his office "at the pleasure of the Pres-
ident and until his successor is chosen and qualified. "This
removal of the four-year limitation upon the tenure of an
office already held at the pleasure of the President, like the
increase in salary, is one of the few minor compensations for
the extensive curtailment of executive power in other por-
tions of the Act. The purpose and motive of these changes
are too well understood by all in the slightest degree ac-
quainted with the current of recent events to require ex-
planation.

Under the Foraker Law the Governor was at all times
faithfully to execute the laws and in that behalf he was to
have "all the powers of governors of the Territories of the
United States." He now has "general supervision and
control of all the departments and bureaus" and is made
"responsible for the faithful execution of the laws;" but the
express grant of "all the powers of governors of the Terri-
tories" is omitted. Another interesting innovation is to be
found in the provision that the gubernatorial report to "the
Executive Department of the United States to be designated
by the President" is to be transmitted, not to the President
but to Congress. It seems hardly necessary to add that the
provision which makes it the duty of the Governor to per-
form such additional duties and functions as may in pur-
suance of law be delegated to him by the President, is not self-
executing; and that the "departments" indicated in the
phrase "departments and bureaus" are the "executive de-
partments" enumerated in section 13, and not the executive,
legislative and judicial departments to which the larger
general divisons of the law are devoted in the order named.

Under the Foraker Law "A Secretary, an Attorney Gen-
eral, a Treasurer, an Auditor, a Commissioner of the Interior,
and a Commissioner of Education" were to be appointed "by
the President, by and with the advice and consent of the

Senate, *for a period of four years unless sooner removed by the President.*" These, together with "five other persons of good repute, to be also appointed by the President for a like term of four years, by and with the advice and consent of the Senate," were to constitute an Executive Council. The later Act creates six executive departments, designates the heads thereof by name, and then provides that "the Attorney General and the Commissioner of Education shall be appointed by the President, by and with the advice and consent of the Senate of the United States, to hold office *for four years and until their sucessors are appointed and qualified, unless sooner removed by the President.* The heads of the four remaining departments shall be appointed by the Governor, by and with the advice and consent of the Senate of Porto Rico. The heads of departments appointed by the Governor shall hold office *for the term of four years and until their succesors are appointed and qualified, unless sooner removed by the Governor.*"

With the exception of the gubernatorial chair and perhaps, in the minds of some, the office of Attorney General, the secretaryship was regarded as the most important and was the most coveted of the insular executive offices. The first Secretary was a distinguished jurist, who later became Governor and is now a well-known federal circuit judge. Twice a vacancy in the office of secretary was filled by the promotion of other members of the Executive Council, one of whom later became Governor. This office was not carried forward as an executive department, nor was the salary increased as occurred in every case where the former executive officer was converted into the head of an executive department. The office of secretary, by the terms of section 52, is expressly abolished. Section 22, however, simply provides "that there shall be appointed by the Governor, by and with the advice and consent of the Senate of Porto Rico, an Executive Secretary at an annual salary of $4,000." It then proceeds

to prescribe certain duties, and to ordain that the incumbent of this newly created office shall "perform such other duties as may be assigned to him by the Governor of Porto Rico." Without going into details, it will suffice to say that the office of Executive Secretary here referred to is not the office of Secretary created by the Foraker Law, nor a continuation or recrudescence thereof under a new name, but is to-day a mere adjunct to the office of the Governor. No doubt the exceptionally close and personal relations necessarily existing between the Governor and his immediate executive subordinate were deemed sufficient, without affirmative legislative action, to lend whatever additional force might be necessary to the doctrine of an implied power of removal, "in the absence of statutory provisions to the contrary."

Section 34 of the Foraker Law, after creating "the District of Porto Rico," provided that "the President, by and with the advice and consent of the Senate, shall appoint a district judge, a district attorney, and a marshal for said district, *each for a term of four years, unless sooner removed by the president.*" Section 41 of the Jones Act follows this language in creating a local federal judicial district and then proceeds: "The President, by and with the advice and consent of the Senate, shall appoint one district judge, who shall serve *for a term of four years and until his successor is appointed and qualified* and whose salary shall be five thousand dollars per annum. There shall be appointed in like manner a district attorney, whose salary shall be four thousand dollars per annum, and a marshal for said district, whose salary shall be $3,500 per annum, *each for a term of four years unless sooner removed by the President.*" Here the only possible purpose of the amendment, and the understanding by Congress as to its power to fix a term, are so palpable that any comment would seem worse than superfluous.

The final sub-title of our first Organic Act (Section 33 *et seq.*) was "The Judiciary."

The first paragraph of that subdivision reads as follows (italics ours):

"Sec. 33.—That the judicial power shall be vested in the courts and tribunals of Porto Rico as *already established and now in operation, including municipal courts, under and by virtue of General Orders numbered* one hundred and eighteen as promulgated by Brigadier General Davis, United States Volunteers, August sixteenth, eighteen hundred and ninety-nine, and *including also the police courts* established by General Orders numbered one hundred and ninety-five, promulgated November twenty-ninth eighteen hundred and ninety-nine, by Brigadier General Davis, United States Volunteers, and *the laws and ordinances of Porto Rico and the municipalities thereof in force,* so far as the same are not in conflict herewith, *all which courts and tribunals are hereby continued.* The jurisdiction of said courts and the form of procedure in them, *and the various officials and attachés thereof,* respectively, shall be the same as defined and prescribed in and *by said laws and ordinances, and said General Orders* numbered one hundred and eighteen and one hundred and ninety-five, *until otherwise provided by law;* Provided, however, That the chief justice and associate justices of the Supreme Court and the marshal thereof shall be appointed by the President, by and with the advice and consent of the Senate, and *the judges of the district courts shall be appointed by the Governor,* by and with the advice and consent of the Executive Council, and all other officials and attachés of all the other courts *shall be chosen as may be directed by the Legislative Assembly, which shall have authority to legislate from time to time as it may see fit with respect to said courts, and any others they may deem it advisable to establish,* their organization, the number of judges and officials and attachés for each, their jurisdiction, their procedure, and *all other matters affecting them.*"

The penultimate chapter of our present Organic Act is entitled "Judicial Department" and comprises sections 40 to 49, the first and last mentioned of which read thus (italics ours):

"Section 40.—That the judicial power shall be vested in the courts and tribunals of Porto Rico *now established and in operation under and by virtue of existing laws.* The jurisdiction *of said*

*courts* and the form of procedure in them, *and the various officers and attachés thereof, shall also continue to be as now provided* until otherwise provided by law; Provided, however, That the Chief Justice and Associate Justices of the Supreme Court shall be appointed by the President, by and with the advice and consent of the Senate of the United States, *and the Legislature of Porto Rico shall have authority, from time to time as it may see fit, not inconsistent with this Act, to organize, modify, or rearrange the courts* and their jurisdiction and procedure, except the District Court of the United States for Porto Rico.

"Section 49.—That hereafter all judges, marshals, and secretaries of courts *now established or that may hereafter be established in Porto Rico,* and whose appointment by the President is not provided for by law, shall be appointed by the Governor, by and with the advice and consent of the Senate of Porto Rico."

Sections 34 of the former Act and 41 of the present law both refer to the local federal court and cover substantially the same subject-matter. The matters mentioned in section 35 of the Foraker law are covered by sections 42 and 43 of the new law. Sections 44 to 47 of the Jones Act relate exclusively to the local federal court and cover the matters previously contained in sections 2 to 4, inclusive, of an amendment of March 2, 1921. Section 48 simply authorizes the issuance of the writs of habeas corpus and mandamus by the insular courts.

Section 49 of the Jones Act must be construed in connection with section 40 thereof, and both in the light of previous legislation.

Let us not forget that the judges, marshals and secretaries to be appointed by the Governor under the terms of section 49 are officers of "the courts now established or that may hereafter be established in Porto Rico." These "courts now established" are the "courts and tribunals now established and in operation under existing laws" mentioned in section 40. These very "judges, marshals and secretaries," once appointed by the Governor, are included among "the various

officers and attachés" of the courts "now established and in operation under and by virtue of an existing law." The status of these officers is inseparably linked with "the jurisdiction of said courts and the form of procedure in them." These officers and therefore, their powers, duties and tenure of office, "shall continue to be as now provided until otherwise provided by law,"—not "until their successors shall have been named as herein provided," but "until otherwise provided by law." Section 49 is as much a part of section 40 as it would be if incorporated therein by means of an additional proviso.

And again, out of superabundance of caution, in section 55 we find an express statement of a purpose to *"preserve the integrity of all"* existing courts, as well as their jurisdiction, "until otherwise provided by law, except as in this Act otherwise *specifically* provided." The final subdivision of the Jones Act is entitled "Miscellaneous Provisions" and section 55 is one of those broad yet specific safeguards against possible misinterpretation of anything contained elsewhere in the law.

These plain and emphatic statements, made with special reference to existing courts, are of course supplementary to the more general provisions of section 57, which reads as follows:

"Section 57.—That the laws and ordinances of Porto Rico now in force shall continue in force and effect, except as altered, amended, or modified herein, until altered, amended or repealed by the legislative authority herein provided for Porto Rico or by Act of Congress of the United States; and such legislative authority shall have power, when not inconsistent with this Act, by due enactment to amend, alter, modify or repeal any law or ordinance, civil or criminal, continued in force by this Act as it may from time to time see fit."

Construing these various sections together, and in the light of the existing laws referred to, the intention of Congress plainly expressed would seem to be to continue in full force,

operation and effect existing laws relative to the organization and integrity of the insular courts, including "the various officers and attachés thereof," at least, in so far as they can be reasonably reconciled or permitted to stand together with the provisions of the new Organic Act. And this is in full consonance with the general principle that "while a new Constitution is, by its very nature, intended to supersede a prior Constitution, it is not intended to supersede the entire body of statutory law. To the extent, therefore, that existing statutes are not expressly or impliedly repealed by the Constitution, they remain in full force and effect." 12 Cyc. 725.

It is no answer to this merely to say that "specific terms covering the given subject-matter will prevail over general terms," for the simple reason that section 49 contains no specific provision for removal, as (with the sole exception of the Executive Secretary) occurs in every other instance in which the power of appointment is conferred directly upon the Governor by the Organic Act. The doctrine of *Kepner* v. *United States* and of the other cases cited as *in pari materia* can not be tortured into authority for the proposition that an unnecessary and rather more than doubtful implication in one part of the Organic Act can override and nullify an intention clearly expressed in other parts of the same law. Much more to the point is the excerpt from *Township* v. *Talcott, supra,* which, curiously enough, was cited in connection with the contention that "where a certain power is given by a constitution all the incidents of that power are given with the grant and any act of a legislature in derogation or limitation of that power or any of its incidents is unconstitutional and void."

Counsel for the Governor do not claim that in the absence of section 49 the Legislature would have less power under section 40 of the Jones Act than it had under Scetion 30 of the Foraker Law. But it is said that the elimination of the provision that all officers and attachés, except the judges and marshal of the Supreme Court and judges of the dis-

trict courts were to "be chosen as may be directed by the Legislative Assembly," and the substitution therefor of the power of appointment conferred upon the Governor by section 49, deprived the Legislature of the power to place any limitation upon such appointing power from and after the approval of the Jones Act. Then *Sayers* v. *Wilmington* and *Monaghan* v. *Lewis, supra,* are cited in support of the proposition embodied in a loose expression, found in the case last mentioned, to the effect that "if an act passed prior to the time the constitution took effect would be invalid if passed after that time, then such prior act would be rendered invalid by the constitution."

These cases are not in point and do not sustain the broad statement contained in the isolated extract just quoted, which must be construed in connection with the context and in the light of the previous decision by the same court cited as authority therefor.

In the *Sayers Case* the court held, to quote the syllabus:

"Const. art. 8, par. 1, providing that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general law, but that the general assembly may exempt from taxation such property as shall best promote the public welfare, does not repeal acts of the legislature exempting property enacted prior thereto."

What the court said, *arguendo,* in regard to the question of repugnancy or inconsistency must be understood as bearing upon that point, and construed in connection with the context and in the light of the facts and circumstances involved. The sum and substance of the whole argument is that, if the Legislature had power under a new Constitution to create exceptions to a general rule prescribed therein, then prior legislation, valid under the old Constitution, establishing such an exception, was not necessarily inconsistent with the general rule so laid down.

The case does not hold that valid legislation enacted under a clear constitutional grant is necessarily and always repealed by implication or inference from an omission to confer equally specific and plenary powers under a new constitution. On the other hand it is authority for the proposition that a general rule for the future, prescribed in a new constitution, does not necessarily operate a repeal of previous laws establishing exceptions, qualifications or limitations within the contemplation of the framers of the Constitution and therefore not in conflict with such general rule.

In *Monaghan* v. *Lewis* the same court, after holding that a certain Act had been repealed by a subsequent law, also held that the previous Act was inconsistent with a constitutional provision.

In neither of these Delaware cases was the court considering the scope or extent of the legislative power under the constitutional grant and independently of the question of inconsistency discussed. The reasoning, as far as it goes, is sound, but neither opinion pretends to lay down a universal rule or test by which to measure the constitutional powers of a legislature, nor is it held that in all cases previous legislation is annulled, simply because the legislature, for want of a specific grant, could not have enacted the same laws after the adoption of the new constitution.

If, in the case at bar, a law fixing a term, where none existed before, would be invalid, not for want of an adequate grant of power to create and legislate with regard to the office, but solely and exclusively by reason of a "direct conflict" and necessary inconsistency with section 49, then, of course, similar legislation previously enacted would be equally repugnant to the same constitutional provisions and therefore void. That is self-evident, and that is all the two Delaware cases, fairly construed, can be said to establish.

Section 49 does not limit even prospectively the preceding grants of legislative power beyond an implied prohibition

against undue or unreasonable restriction of the power of appointment vested in the Governor, which as we have shown, does not necessarily include an absolute power of removal.

In addition to the more specific terms of section 40, we find these previous and broader provisions:

"Sec. 25.—That all local legislative powers in Porto Rico, except as herein otherwise provided, shall be vested in a Legislature which shall consist of two houses, one the Senate and the other the House of Representatives, and the two houses shall be designated 'the Legislature of Porto Rico.' "

"Sec. 37. — That the legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable, including power to create, consolidate, and reorganize the municipalities so far as may be necessary, and to provide and repeal laws and ordinances therefor; also the power to alter, amend, modify, or repeal any or all laws and ordinances of every character now in force in Porto Rico or municipality or district thereof in so far as such alteration, amendment, modification, or repeal may be consistent with the provisions of this Act.

"No executive department not provided for in this Act shall be created by the Legislature, but the Legislature may consolidate departments, or abolish any department, with the consent of the President of the United States."

And, lest we forget, section 49 upon its face recognizes and expressly covers the future contingency of courts "that may hereafter be established in Porto Rico."

"Further it is a general rule in the construction of statutes that when in the earlier and declaratory sections the scope and extent of the power and privileges granted are once stated, the character of the grant as thus disclosed controls and interprets all subsequent sections; and it is unnecessary in each subsequent section to restate or use words and expressions which shall fully disclose the extent of those powers and privileges; but these subsequent sections will be understood (unless there be words of restriction and limitation therein) as coextensive with and applicable to the scope, and the full scope, and extent of the powers theretofore granted." *Talbott* v. *Silver Bow County,* 139 U. S. 443-4.

Whether or not the local assembly, under its general legislative powers or under the specific authority "from time to time, as it may see fit, not inconsistent with this Act, to organize, modify or re-arrange the courts," has the power to create new courts, and to fix the terms of the judges and other officers thereof, is another question. But, even if Congress had expressly prohibited future reorganization, change or modification of the courts now in existence, thus depriving the insular Legislature of all power to act, it would not neccessarily follow that previous legislation in this regard was thereby invalidated. The general rule is that: "A constitutional provision that the legislature. shall not pass laws of a certain character, operates prospectively only and does not render invalid statutes already in existence." 12 Corpus Juris, 726, note 17 (a) and cases cited.

Those interested in the history of our insular courts may find a helpful starting point for such investigation in a sketch entitled "The Judiciary in Porto Rico" by the late senior Associate of this court, Mr. Justice McLeary, published in Vol. 3, Opinions of the Attorney General of Porto Rico, 1912, at page 585.

Without going into details we may say that in 1904 a radical and complete reorganization of the judiciary was effected by the insular Legislature.

The Attorney General who wrote or closely supervised the original drafts of these laws was a man learned in the law, skilled in the use of the pen, possessed of an accurate knowledge of the meaning of words and a mature judgment ripened by years of experience as United States Attorney, judge of a Territorial Supreme Court and member of Congress. These laws were approved, in their final form, by one of the keenest legal minds that has ever scrutinized the acts of our local Legislature.

As we have shown, section 33 of the first Organic Act expressly provided that "the judges of the district courts

shall be appointed by the Governor, by and with the advice and consent of the Executive Council," but was silent as to tenure, salaries, duties and qualifications for office. Yet the Legislature did not hesitate in section 2 of the "Act reorganizing the judiciary of Porto Rico," etc., to prescribe such qualifications and duties, to fix the salary and to provide that "the Governor, by and with the advice and consent of the Executive Council, shall appoint all the district judges for a period of four years." Section 7 said that "all the municipal judges whose offices are created by this act shall be elected by popular election." No term was mentioned. Section 10 provided that "there shall be a marshal for each municipal court, who shall be elected by popular vote," but was silent as to tenure. Section 11 contained a like provision as to secretaries, with like omission of all reference to duration.

Another act created the office of district marshal. Sections 31 and 32 read as follows:

"Sec. 31.—*Term of office of Marshal.*—The term of office of the marshal shall be for four years; but he shall be subject to removal at any time by the Governor, for cause shown.

"Sec. 32.—The marshal shall be chosen by the qualified electors of the district which he serves at the next election; and the person so elected shall become the successor of the incumbent at that time holding said office, regardless of his time of service; *Provided,* that said office shall be held by appointment for a period from the time this Act takes effect until the person elected shall take possession of his office, which will be on January 1, 1905." Laws of 1904, p. 117.

A third act "creating the office of secretary of district court," provided in section 8 that "the secretary shall be chosen by the qualified electors of the district which he serves at the next election," but no term was specified.

The first section of another act of even date provides that: "The Governor, by and with the consent of the Executive Council, shall appoint a fiscal for each judicial district, whose term of office shall be for four years and his commission

shall cease and expire at the expiration of said four years from the date of the appointment.''

We need not dwell upon the various considerations which may have influenced the Legislature in following here the language of the federal statute in providing for the appointment of United States attorneys, and, incidentally or otherwise, the phraseology construed in the *Parsons Case*. A number of obvious reasons could be suggested why it might be deemed desirable that a prosecuting attorney, as distinguished from other officers of the court, should be placed under the immediate administrative control of the executive department of the government. It will suffice to say, in passing, that, for the purposes of this case, it may be conceded, without holding, that the intention of the Legislature in the law last mentioned was that the district attorney should not in any event continue in office for a longer period than that specified.

A year later, section 8 of the ''Act creating the office of secretary of district court'' was amended to read, in part, thus: ''The term of office of the secretary shall be for four years; but he shall be subject to removal at any time by the Governor for cause shown. The secretary shall be chosen by the qualified electors of the district which he serves at the next election;''   *   *   *

And sections 7, 10 and 11 of the ''Act reorganizing the judiciary of Porto Rico,'' etc., were also amended to read, in so far as pertinent, as follows:

''Sec. 7.—The term of office of municipal judges whose offices are created by this act shall be for four years; but they shall be subject to removal at any time by the Governor for cause shown. The municipal judges shall be chosen by popular election;''   *   *   *

''Sec. 10.—There shall be a marshal for each municipal court, whose term of office shall be for four years; but he shall be subject to removal at any time by the Governor for cause shown. The marshal shall be elected by popular vote;''   *   *   *

''Sec. 11.—There shall be a secretary for each municipal court,

whose term of office shall be for four years; but he shall be subject to removal at any time by the Governor for cause shown. The secretary shall be elected by popular vote:'' * * *

The purpose of the provision in 1904 that the Governor should appoint ''all the district judges for a term of four years'' was not to indicate the method of election. That was a matter that had been definitely determined and placed beyond the control of the local Legislature by the Organic Act. The only possible intention was to fix a term of four years. On the other hand, in providing for the election of municipal judges, marshals and secretaries, the question of tenure apparently was never considered at all. The purpose was to confer upon the municipalities as an experimental measure a larger degree of local self-government through a change in the method of selection. The fixing of a definite term was an afterthought and hence the omission was supplied in 1915. But then the mind of the Legislature was not concerned with the manner of choosing the officers in question. That, for the time being, had been settled. The purpose was to fix a term. Hence the law does not say that municipal judges shall be elected for a term of four years or at every alternate election but, first and foremost, that ''the term of office of municipal judges whose offices are created by this act shall be for four years; but they shall be subject to removal at any time by the Governor for causes shown.'' Then, in a separate, distinct and independent sentence the provision of the former law as to the method of selection is added with a proviso to cover the period of transition. The matter of terms is as separate and distinct from that of the manner of selection as is the provision with reference to the term of office of the marshal of the district court in section 31, *supra,* of the law of 1904, from the subject-matter of section 32 of that law, also quoted above.

The provision of section 8 of the law of 1904, which says that ''the municipal judge shall be a lawyer, over twenty-one

years of age, admitted to the bar of the Supreme Court of Porto Rico, of good standing and practicing his profession before the insular courts, and who is a resident of the territory of Porto Rico," is even more closely related to the matter of election than is the term of office fixed by the amendment of 1905. And, as will appear from the text of the amendments above quoted, what we have said in regard to the term of the municipal judge is equally applicable to the term of the municipal secretaries and marshals. Again we find the same method duplicated in the case of the secretary of the district court, showing in each instance that in 1904 the dominant idea, if not the only thought, in so far as these elective officers were concerned, was a change in the method of selection, while in 1905 the Legislature was dealing with the matter of terms and the provisions as to election were incorporated only as a necessary incident in order to carry forward in the law as amended things covered by the previous enactment.

We have gone somewhat into detail in this regard only because of the effort that has been made to merge the terms of office fixed by law into the provision for election by popular vote, so that the whole matter may be said to have been covered by section 49 of the Jones Act. But, even if this metaphysical merger were feasible in the case of elective officers, we would still have the district judges who have never been elected, in whose method of selection no change had been made nor could have been made save by congressional action, but whose terms of office and qualifications for office had been clearly defined by the local Legislature. Section 49 cannot be construed to mean one thing in the case of the district judges and another in the case of all other officers whose terms had been fixed by law. The case of *District of Columbia* v. *Hutton, supra,* upon which considerable stress has been laid, like most others of the same ilk, carries its own comment.

When the laws of 1904 were passed there was much misgiv-

ing in the minds of many people as to the propriety and wisdom of the provision for the election of municipal judges. The pessimistic prophecies of those who did not approve of the policy then adopted later came to pass to some extent; and the mischief which Congress sought to remedy in 1917 did not arise out of the terms of office and qualifications for office that had been established by law, but rather and exclusively out of the method prescribed for the selection of the officials in question and especially of the municipal judges. The purpose, and the sole purpose, was. to remove the municipal courts and together with them the marshals and secretaries of the district courts from the influence of partisan politics. There is no satisfactory ground upon which to base the imputation of an intention to repeal any part or portion of existing laws that was not so deeply imbedded in these provisions for election by popular vote as to be indistinguishable therefrom and incapable of standing alone or together with other provisions not necessarily repugnant to the idea of selection by appointment.

Congress knew in 1917 that the provision in the Organic Act of 1900 for appointment of district judges by the Governor had been construed by the insular Legislature as not inconsistent with the fixing of a term and the specification of qualifications for the office. They were fully aware that (with the single exception of the marshal of this court, a presidential appointee under the Foraker Law) the term of office of every officer whose appointment by the Governor was authorized under section 49 had been fixed by law for more than a decade. They thoroughly understood the effect of a statutory term upon the question of an implied power of removal as an incident to the power of appointment. They were equally conversant with the rule that repeals by implication are not favored.

If, in the circumstances, Congress had intended to repeal these local laws as to terms and qualifications, together with

the statutory provisions for selection by popular vote, it is
not unreasonable to suppose that some reference would have
been made to the power of removal which it is now claimed
was vested in the Governor.   On the other hand, in the absence
of any such intention no mention of a tenure was required,
because (with the solitary exception already indicated) the
term of every office in question had been fixed by local law.
But if an intention to repeal by implication the statutory
provisions as to terms of office may be imputed to Congress,
then *a fortiori* a like intention may be said to exist as to
provisions prescribing the qualifications for office.   *A for-
tiori*, because the fixing of a term affects only the power of
removal alleged to be implied from the power of appointment,
while the specification of qualifications is a direct limitation
upon the power of appointment itself.   Yet in the light of
the other sections *in pari materia* already considered, such a
purpose seems well nigh inconceivable.   And, as already sug-
gested, repeals by implication are not favored.

"The legislature has general authority to prescribe the qualifica-
tions of officers where they are not prescribed by the constitution,
and in this way it may limit the executive choice, even though it is
without power to make the appointment or to designate the officer
by whom it shall be made.

"So the legislature may prescribe the salary or wages of an of-
ficer or employee, even though the appointment is vested by the
constitution in an executive officer."   12 C. J. 837.

See also 29 Cyc. 1375; 22 R. C. L. pp. 400, 401, secs. 40, 41
and 42.

The validity of the reorganization of the judiciary ac-
complished by the local Legislature in 1904 was promptly chal-
lenged.   The first case was disposed of *per curiam* citing sec-
tions 33, 34, 35 and 15 of the Foraker Law, our laws of 1904,
pp. 103, 104, 110, and several cases.   *Dones* v. *Urrutia,* 202
U. S. 614.   When the same question was submitted a year

later a severe rebuke was administered by the Supreme Court in *Kent* v. *People of Porto Rico,* 207 U. S. 113.

In *Kawananakoa* v. *Polyblank,* 205 U. S. 349, counsel for appellants submitted, among other things, that—

"The Territory of Hawaii is a municipal corporation with capacity to sue and be sued. 1 Dillon on Municipal Corporations, sec. 20; 1 Thompson on Corporations, sec. 1.

"This court has called the Territories 'organized municipalities' and likened them to the District of Columbia. *Talbott* v. *Silver Bow Co.,* 139 U. S. 438, 445.

"The closest analogy that can be drawn is between the Territory of Hawaii and the District of Columbia. The latter has been held to be a municipal corporation. *Barnes* v. *District of Columbia,* 91 U. S. 540."

The third paragraph of the syllabus reads thus:

"A Territory of the United States differs from the District of Columbia in that the former is itself the fountain from which rights ordinarily flow, although Congress may intervene, while in the latter the body of private rights is created and controlled by Congress and not by a legislature of the District."

The same contention was made with reference to the form of government established for this Island in *Rosaly* v. *The People* 16 P. R. R. 481, and the dissenting opinion by Mr. Justice McLeary contains an instructive discussion of the matter beginning at page 493. The decision of the Supreme Court of the United States in the case last mentioned should have sufficed to lay the ghost of that proposition in this jurisdiction. The case is reported in 227 U. S. 270, and at page 274 the court repeats what was said in the previous case of *Gromer* v. *Standard Dredging Co.,* 224 U. S. 362, where at page 370 and construing the Foraker Law it had been stated that: "The purpose of the act is to give local self-government, conferring an autonomy similar to that of the States."

And in *Camuñas et al.* v. *Porto Rico Ry., Light & Power*

*Co.,* 272 Fed. 924, the Circuit Court of Appeals, First Circuit, says:

"The Organic Act of March 2, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, secs. 3803a–2803z) vests very broad general powers in Porto Rico. In section 5 Porto Rican citizen are declared to be citizens of the United States. Porto Rico is now sovereign. Porto Rico v. Rosaly, 227 U. S. 270, 33 Sup. Ct. 352, 57 L. Ed. 507.

"By section 37, the Legislature is given broad and inclusive powers: (Quoting section 37, supra.)

"Manifestly this grant of power is nearly, perhaps quite, the equivalent of the power of a state Legislature to enact all laws not inconsistent with the federal or the state Constitution. The Organic Act is the practical equivalent of a state Constitution. The fact that it remains subject to amendment or repeal by Congress is for present purposes immaterial. In that regard, Congress stands as to Porto Rico in the place of the people of a state, acting directly or indirectly through a constitutional convention."

See also *Hornbuckle* v. *Toombs,* 85 U. S. (18 Wall.) 648; *Territory* v. *O'Connor,* 41 N. W. 746; *Sims* v. *Sims,* 175 U. S. 162; *De la Rama* v. *De la Rama,* 201 U. S. 303; *Nelson* v. *United States,* 30 Fed. Rep. 112; *Ponce* v. *Roman Catholic Church,* 210 U. S. 296, and *Christianson* v. *King County,* 239 U. S. 356.

Of course, Congress might have conferred upon this Island the limited legislative powers usually contained in the charter of a municipality of the lowest rank, or it might have legislated for us directly as it has done for the District of Columbia. But, in its wisdom, it has done neither. It has said to our Insular Legislature in substance and in language too plain to be easily misunderstood: "We hereby bestow upon you all the powers of a sovereign state, subject only to such slight restrictions and limitations as are expressly provided herein, or necessarily implied from the terms of this act. This is a two-edged sword. Take it and use it. May your wrist grow strong and flexible and may you wield this great

power with wisdom and judgment in opening the way to the
goal of all good government.''

It may or may not be true that much of the foregoing has
all the ear-marks of a crusade against windmills.

In any event this is a most unfortunate case. It is un-
fortunate that the question involved should ever have arisen.
It is unfortunate perhaps that we were unable to agree upon
the order *per curiam* first submitted by the former Chief
Justice. It is unfortunate that we have been unable to agree
upon any of the various memorandums subsequently submit-
ted including the present disquisition. It seems unfortunate
that we have been obliged to cover so much unprofitable
ground. It is unfortunate that we have not had sufficient
time to digest and assimilate the numerous state cases which,
without any intimation of how or why, are said to point to
conclusions contrary to these arrived at herein.

The hasty and rambling review of these cases attempted,
*supra,* without the aid of counsel, and without opportunity to
weigh and balance them against others *in pari materia* and to
formulate a clear statement of the result, leaves much to be
desired. But, inasmuch as we are considering the issuance
by a divided court of a mandate addressed to the chief ex-
ecutive of the Island, we have deemed it proper to follow, in
outline at least, and to discuss to some extent, as many
theories as have been successively set up in opposition to the
granting of the writ.

We have no disposition to interfere with; nor would we
entertain for a moment any suggestion contemplating a judi-
cial review of, the broad discretion vested in the executive in
dealing with the question of removal and in weighing the
evidence, after a notice and a hearing. The giving of such
notice and of an opportunity to defend is no great hardship,
nor under the previous decisions of this court can it be re-
garded as amounting even to a serious inconvenience.

Assuming, as we do, the existence of a proper motive

underlying the attempted removal herein, a compliance with the law may appear to be a mere formality. But it is a formality which when invoked cannot be brushed aside and ignored. In purpose and in fact it is not a bit of red-tape, but a lifegiving principle of prime importance.

The writ must issue.

*Alternative writ granted.*

Chief Justice Del Toro and Justices Aldrey and Franco Soto concurred.

Mr. Justice Wolf dissented.

DISSENTING OPINION OF MR. JUSTICE WOLF.

In the absence of some due provision of law to the contrary the grant of an absolute power of appointment is the grant of an absolute power of removal. *Ex Parte Hennen,* 13 Peters, 230; *Shurtleff* v. *United States,* 189 U. S. 311; *Burnap* v. *United States,* 252 U. S. 515, and cases; *Clayton* v. *Utah Territory,* 132 U. S. 632; Dillon on Municipal Corporations, par. 462, par. 473; 22 R. C. L. 562; 29 Cyc. 1371; 29 Cyc. 1408.

What is implied in a statute or a grant is as much a part thereof as if the implied part were written in the grant itself. *United States* v. *Babbitt,* 1 Black, 561; *Tel. Co.* v. *Eyser,* 19 Wall. 427; *Luria* v. *United States,* 231 U. S. 9, 24; 12 C. J. 719; 36 Cyc. 1112.

Section 49 of the Organic Act, when it said that "hereafter all judges, marshals, and secretaries of courts now established or that may hereafter be established in Porto Rico, and whose appointment by the President is not provided for by law shall be appointed by the Governor," in terms at least, with regard to the officers named, granted an absolute power of appointment and removal to the Governor.

These propositions are not seriously disputed. The attempt, as I understand it, is to assert that municipal judges, at the time of the passage of the Organic Act, had a fixed

term of four years; that Congress ratified the existence of the previous legislation of Porto Rico, and hence that the Governor may not remove a municipal judge without notice and a hearing. The effect of this contention is that the grant of power of appointment and removal is given with the limitation that, in removing a municipal judge, notice and a hearing are conditions precedent. I maintain that with the passage of section 49 of the Organic Act the existence of a limitation on the power of removal is inconsistent with the absolute grant of power given by said section. I further maintain that municipal judges in Porto Rico before 1917 had solely an elective term and that such term vanished with the abolition of the election.

The right to notice and a hearing is an incident of the existence of a term, a common law development. The power of removal is an incident of the power of appointment, likewise a common law development. As incidents, neither has any historic or transcendental advantage over the other. For officers whose terms are not fixed by a constitution the legislative power may confer on the Governor the absolute right of removal, or may place a limitation thereon as it deems fit. However, I maintain that when Congress gave a power of appointment without any limitation it expressed its intention that the incident of removal should go with it, and that the creation or existence of a term cannot carry its ordinary incidental limitation with it. Where the two incidents are inconsistent, the incident created by the lesser power must yield to the incident granted by the greater power, the Congress of the United States. *In praesentia majoris cessat potentia minoris.*

Constitutions must receive an uniform construction, as all agree. Where Congress has named a number of officers who may necessarily be removed by the Governor, the fact that one or more of such officers had a fixed term cannot affect the general intention of Congress as evidenced by the words used.

Three times, at least, in the Organic Act an absolute power of appointment is conferred. The President has it with regard to the judges of this court. The federal judge has it with regard to certain of the officials of his court. The Governor has it as set out in section 49. There is no reason to suppose that the intention of Congress was different when almost exactly the same language is used in each section. The subsequent indication in the Organic Act that local legislation not inconsistent therewith should subsist cannot avail as against the positive grant of power conferred on the Governor.

I need not maintain that the Legislature has no power to fix a term for the officers named in section 49. The Legislature may have, and probably has, this power. What I do assert is that if there is an existing term, or if a term is created for the officers named in section 49, the resultant of the two forces, the power of appointment and removal given by Congress and the fixing of a term by the Legislature, is to give a particular appointee a definite term of office unless sooner removed by the Governor. Throughout the Organic Act and in other acts of Congress certain officials are appointed for terms unless sooner removed. I apprehend that in any such case no notice or hearing would be necessary, but an adverse holding could not affect this case if, as I maintain, the power of removal is absolute.

Section 49 of the Organic Act, by doing away with the election of municipal judges, abolished their term. In form the Act of 1905 gave the municipal judges an absolute term of four years, but it was a term that ran from election to election, and that was plainly the intention of the Legislature, in my opinion. A single example should make this clear. If a particular municipal judge died or resigned, the Governor, under the law, could not appoint a substitute for four years, but only to fill out the unexpired term. There was no such

thing as an appointive municipal judge except for unexpired terms. It was a system of election of officers that prevailed.

The transcription of section 7 of the Judiciary Act of March 10, 1904, as amended by the Act of March 9, 1905, will make my meaning more apparent.

"Section 7. The term of office of municipal judges whose offices are created by this Act shall be for four years; but they shall be subject to removal at any time by the Governor for cause shown. The municipal judges shall be chosen by popular election; *Provided,* that for a period from the time this Act takes effect until the next election shall be held and the elected municipal judges shall take possession of their offices, which will be on January 1, 1905, the Governor, by and with the consent of the Executive Council, shall appoint a municipal judge for each district, as provided in section 8 of this Act. The municipal judges of San Juan, Ponce and Mayagüez must be over twenty-five years of age; they shall be lawyers of good standing, admitted to the bar of the Supreme Court of Porto Rico, and practicing before the Insular Courts."

I therefore dissent from the majority opinion.